SDS INTERNATIONAL, Plaintiff,

v.

The UNITED STATES, Defendant,

and

NLX Corporation, Defendant–Intervenor.

No. 00–609 C.

United States Court of Federal Claims.

March 2, 2001.[1]

---

1. **This opinion and order was issued under seal on January 29, 2001. Pursuant to ¶ 3 of the** ordering language in the January 29, 2001 opinion and order, the parties were instructed to identify protected/privileged material subject to deletion. Only intervenor proposed redactions. Brackets identify where material has been deleted. Intervenor also suggested a correction to a factual inaccuracy in the January 29, 2001 opinion and order. *See* n. 3 *infra.*

Barbara S. Kinosky, McLean, VA, for plaintiff. James S. Phillips and Francis E. Purcell, Jr., of counsel.

Mark L. Josephs, with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Mark A. Melnick, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. Warren D. Leishman, Department of the Air Force, of counsel.

David R. Johnson, Washington, DC, for defendant-intervenor. James D. Slear and Michael K. Murphy, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This is a post-award bid protest action brought by an unsuccessful offeror against the United States. Plaintiff, SDS International (plaintiff or SDS), protests the decision of defendant, Department of the Air Force (defendant or Air Force), to award a contract to NLX Corporation (intervenor or NLX) for contract aircrew training (CAT) and courseware development (CWD) for F–4 airplanes. NLX is an intervenor in this proceeding. The matter is before the court on plaintiff's request that the court enjoin the performance of the contract by any offeror other than plaintiff. The parties have filed cross-motions for summary judgment and for judgment on the administrative record.

Plaintiff argues that defendant's evaluations of plaintiff's and intervenor's technical proposals were inconsistent; that defendant's evaluations of plaintiff's and intervenor's past performance were unreasonable; and that the discussions that defendant conducted with plaintiff and intervenor were not equivalent. Defendant and intervenor contend that defendant's evaluations of plaintiff's and intervenor's past performance and technical proposals were reasonable and that the discussions were substantially equivalent.

Plaintiff has also moved for leave to supplement the administrative record. The

court addresses that motion in section II below.

For the following reasons, the court denies the protest.

## I. Background

On March 7, 2000, defendant issued Solicitation and Request for Proposal No. F44650–00–R0004 (RFP). Administrative Record (AR) at 18. The RFP sought proposals for CAT and CWD in connection with the training of pilots for F–4 airplanes. Defendant's Statement of Facts (DSF) ¶ 1.[2] The contract anticipated a two-month phase-in period, a one-year base period, and four one-year option periods. Plaintiff's Proposed Findings of Uncontroverted Fact (PPFUF) ¶ 7. The pilots to be trained were members of the German Air Force. *Id.*

### A. Basis for Award

The RFP stated that each proposal for the F–4 contract would be evaluated under four factors: past performance, mission capability, risk, and price. AR at 39. The RFP stated that the past performance and mission capability factors were of *"primary and equal* importance." AR at 39 (emphasis in original). The risk factor was deemed less important than either past performance or mission capability. *Id.* Price was identified as the least important factor. *Id.* The RFP also stated that "[a]ward will be made to the Contractor whose proposal is determined to be most advantageous (best value) to the Government," and that "[t]he Government will make a subjective evaluation to determine the offeror's technical approach and proposed price that represents the greatest value to the Government." *Id.*

The RFP set out rating systems for each factor and subfactor (other than price) that defendant would consider in making the source selection determination. AR at 39–41. Past performance was to be assigned one of the following ratings: Exceptional/High Confidence, Very Good/Significant Confidence, Satisfactory/Confidence, Neutral/Unknown Confidence, Marginal/Little Confidence, or Unsatisfactory/No Confi-

dence. *Id.* at 40. The RFP explained the meaning of each rating; for instance, the "Exceptional/High Confidence" rating was described as meaning that "essentially no doubt exists that the offeror will successfully perform the required effort," whereas "Very Good/Significant Confidence" was described as meaning that "little doubt exists that the offeror will successfully perform the required effort." *Id.*

The RFP broke Mission Capability into three subfactors, in descending order of importance: Program and Workload Management (PWM), Instructional Systems Development Management Plan (ISD), and Phase-In. Each subfactor was to be assigned a rating of Blue/Exceptional, Green/Acceptable, Yellow/Marginal, or Red/Unacceptable. *Id.* at 40. Blue/Exceptional was described as "[e]xceeds specified minimum performance or capability requirements in a way beneficial to the Air Force," while Green/Acceptable was described as "[m]eets specified minimum performance or capability requirements necessary for acceptable contract performance." *Id.* Risk was assessed for each subfactor, with a rating of High, Moderate, or Low. *Id.* at 41. Moderate risk was defined as follows: "Can potentially cause some disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will probably be able to overcome difficulties." *Id.* Low risk meant that the subfactor "[h]as little potential to cause disruption" and that "[n]ormal contractor effort and normal Government monitoring" would be sufficient. *Id.*

The RFP described the CAT requirements as follows: "The contractor shall conduct academic and training device instruction in support of formal course syllabi, training plans, event lesson plans, and Continuation Training (CT) to formal course students and permanent party aircrew to accomplish required event objectives and specific event tasks." AR at 52. The RFP described the CWD requirements as follows: "Contractor personnel shall produce, update, and revise courseware to support academic and training device instruction, and flight phases of the training system covered under this contract."

---

**2.** None of the statements taken from any party's statement of facts is disputed by any other party.

*Id.* at 54. The RFP did not include an estimate of the required staffing for CAT or CWD tasks.

### B. Proposals

Plaintiff, intervenor, and three other companies made proposals in response to the RFP. DSF ¶ 12. Plaintiff's technical proposal stated that plaintiff intended to cover CAT tasks by hiring two full-time instructors and one part-time instructor (equivalent to one half man-year), one site manager who would spend 60% of his time on CAT tasks and 40% of his time on management, and one Instructional Developer who would spend 50% of his time on instruction and 50% of his time on CWD tasks. AR at 673. Intervenor proposed five instructors for CAT tasks, along with a site manager, whom intervenor described as "a fully qualified instructor who teaches on a regular basis" who "is available to pick up the load when instructors are on vacation or are sick or have a family emergency." AR at 911. Intervenor did not allocate a specific percentage of the site manager's time to instruction.

Both plaintiff and intervenor included past performance information in their proposals. Plaintiff submitted three of its Contract Performance Assessment Reports (CPARs), assessments by contracting officers of plaintiff's work, along with descriptions of the contracts. Appendix to Plaintiff's Motion for Summary Judgment (Pl.App.) at AR 2740–42, 2749–58. Plaintiff also submitted two descriptions of contracts on which plaintiff had done subcontract work, and three CPARs for Sigmatech, a proposed subcontractor. *Id.* at AR 2763–68; AR at 672. Intervenor submitted four CPARs, two of which were [ ] under intervenor's previous corporate name, Intelx Corporation.[3] Intervenor also submitted descriptions of three other contracts on which it had done work. *Id.* at 856–60, 863–64.

Defendant evaluated each offeror's proposal and gave each offeror an evaluation notice with questions about that offeror's proposal. DSF ¶ 14. Plaintiff's evaluation notice posed

questions about the PWM subfactor, saying that "we are concerned that [the site manager's duties] will overtask this individual." AR at 997. The same paragraph of the evaluation notice stated that "[t]he other manning proposed does not appear to have enough additional capacity to provide a second [Weapons Instructor Course] instructor and cover required ... instruction, courseware development, etc." *Id.* The next question asked plaintiff "how confident" it was "that the full instructor workload can be accomplished with proposed manpower." *Id.* Intervenor's evaluation notice stated that "[p]roposed manpower appears excessive for the total contract effort." *Id.* at 999. Plaintiff and intervenor filed written responses to the evaluation notices and also discussed the evaluation notices with defendant by telephone. *Id.* at 788–93, 975–76, 1011–12. Plaintiff asked defendant what it considered the optimal staffing level for the contract, but defendant declined to answer. *Id.* at 1011. Intervenor also asked defendant whether the incumbent contractor's approach to the ISD process should be preserved, and defendant declined to answer that question as well. *Id.*

Both plaintiff and intervenor revised their proposals after receiving the evaluation notices. AR at 788–93, 977–83. Plaintiff's new manning proposal consisted of three full-time instructors, one Instructional Developer devoting half of his time to CAT tasks, and one site manager spending half of his time on CAT tasks. *Id.* at 791. Intervenor's new manning proposal consisted of four full-time instructors, one Instructional Developer spending 25% of his time on CAT tasks, and, as before, one site manager fully qualified to teach. *Id.* at 977–78.

### C. Award Decision

Defendant's source selection evaluation team (SSET) prepared evaluation worksheets evaluating each offeror's proposal and rating the proposals in each area, *see* AR at 1026–39, and the source selection authority (SSA) issued a Proposal Evaluation Report (attached to which were the evaluation work-

---

**3.** [ ] The court's proposed opinion and order filed on January 29, 2001 mistakenly identified Intelx Corporation as a separate entity and stated that

intervenor was a subcontractor on those contracts. *See* n. 1 *supra.*

sheets), examining the proposals and explaining the ratings. AR at 1040–59. The SSET gave plaintiff a Moderate risk rating with respect to the Personnel Qualification and Management subfactor and gave intervenor a Low risk rating for the same subfactor. AR at 1046, 1048. The source selection authority stated that intervenor's "manning mix provides flexibility to cover all contingencies." *Id.* at 1031. The SSA also noted that plaintiff's "risk was assessed due to over tasking of manning positions and the minimal CAT team proposed" and that "the contractor meets the performance manning/requirement with very little flexibility." *Id.* at 1029.

All of the other ratings given to plaintiff and intervenor were identical. AR at 1046–49. Both plaintiff and intervenor were rated Very Good in past performance. *Id.* at 1046, 1048. The SSA noted that plaintiff had two recent and relevant contracts, namely USAF Weapons School and Cockpit Resource Management (CRM). *Id.* at 1028. The SSA found, in her discussion of the Weapons School contract, that "[t]he instruction was rated as exceptional, but there were difficulties noted in the CWD effort." *Id.* The SSA also mentioned that, with respect to the CRM contract, "[p]ast performance information ... was positive, with some difficulty noted in meeting the phase-in deadline." *Id.* With respect to intervenor, the SSA noted that "[e]xperience was found to be both recent and relevant based upon training device contracts and key personnel represented." *Id.* at 1031.

Defendant awarded the contract to intervenor on June 26, 2000. AR at 1037–39, 1133. The SSA stated that "[t]he primary difference between [plaintiff's and intervenor's] proposals lies in the proposed manning level for aircrew training." *Id.* at 1038. The SSA discussed the respective manning proposals and concluded that there was an "instructor manning difference of approximately .75 man-year," which could "contribute significantly to the likelihood of disruptions of schedule and degraded services." *Id.* The SSA also noted that intervenor intended to hire a recently retired German Air Force officer (GAF) for Weapons Instructor Course (WIC) training and stated that "[t]his deci-

sion provides a definite benefit to the training program and is a reflection of NLX's indepth understanding of the GAF environment." *Id.*

## D. Plaintiff's Protest

Plaintiff filed a protest with the General Accounting Office (GAO) on July 10, 2000. AR at 1099. Plaintiff argued that the SSA's decision was internally inconsistent, that the evaluation of plaintiff's technical proposal was inconsistent with the solicitation requirements, that the evaluation was inconsistent with the conclusions reached in a separate procurement decision, and that defendant had not given plaintiff meaningful discussions that were adequate to apprise plaintiff of the weaknesses in its proposal. *Id.* at 1115–28. Defendant filed an Agency Report in response to plaintiff's allegations on August 15, 2000, arguing that all of the above arguments were meritless. *Id.* at 1146–50. Plaintiff filed comments in response to the Agency Report on August 30, 2000, arguing that defendant's evaluations of plaintiff's and intervenor's past performance were unreasonable and responding to defendant's arguments. *Id.* at 1162–68.

GAO rejected the protest on September 21, 2000. AR at 1202. In its decision, GAO found that plaintiff was barred from arguing that defendant's past performance evaluations were unreasonable because plaintiff had not raised that argument in its initial protest. *Id.* at 1204–05. GAO also found that plaintiff had not responded to defendant's arguments in defense of the SSA's assignment of a Moderate risk rating to plaintiff for the PWM subfactor. *Id.* at 1204. GAO also rejected plaintiff's argument that defendant had not conducted meaningful discussions with plaintiff. *Id.* at 1206–07. Plaintiff requested reconsideration of GAO's decision, contending that the argument regarding the evaluation of the risk factor had not been abandoned and that plaintiff had, in fact, raised the past performance question in its original protest. *Id.* at 1209–16. Plaintiff subsequently brought suit in this court on October 11, 2000. Complaint at 1. GAO dismissed the request for reconsideration because of the pending suit before this court.

AR at 1219. Plaintiff has moved for summary judgment and defendant and intervenor have cross-moved for judgment on the administrative record in the proceeding before the court.

## II. Motions to Supplement the Administrative Record

Plaintiff has filed two motions requesting leave to supplement the administrative record. In one motion, plaintiff requests that the following materials be added to the record: (1) the declaration of William G. Flood, plaintiff's vice president; (2) a corrected version of plaintiff's past performance information as included in its proposal; (3) defendant's "Guidance on Alternate Proposals," distributed to the offerors at the outset of the procurement; and (4) the debriefing materials provided to plaintiff and intervenor. Memorandum in Support of Plaintiff's Request for Supplementation of the Administrative Record (Pl.Mem.). In its other motion, plaintiff requests that selected pages from the administrative record in the case of *SDS International v. United States*, 48 Fed.Cl. 742 (2001) be added to the record in this case. Plaintiff's Motion for Leave to Incorporate Protected Material in CFC No. 610–C into the Record at 1. Defendant does not oppose the inclusion of items 2, 3, and 4 in the record, but opposes the inclusion of Mr. Flood's affidavit and the materials from No. 610 C. The court therefore permits the incorporation into the record of items 2, 3, and 4 and considers whether Mr. Flood's declaration and the materials from CFC No. 610 C should be incorporated into the administrative record.

■ A review of agency actions under the APA is "generally limited to the administrative record developed by the agency." *Marine Hydraulics Int'l v. United States*, 43 Fed.Cl. 664, 670 (1999). Supplementation of the administrative record is appropriate, however, when materials outside the record are necessary to "preserve a meaningful judicial review." *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 345, 350 (1997). Important considerations in deciding whether the record may be supplemented are "whether other materials were considered, or

whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action." *Id.* The question of agency discretion in determining relevance was addressed by the court in its initial order in this matter, which directed that "all materials provided to and/or considered by and/or created by and/or relied on by" defendant be included in the administrative record. Order of October 13, 2000 at 1.

■ Plaintiff has moved to incorporate the Declaration of William G. Flood into the administrative record. Pl. Mem. at 2. The Declaration was created on August 30, 2000. Pl.App. at AR 2724. Plaintiff has represented, and defendant has not denied, that Mr. Flood's declaration was furnished to GAO in the course of plaintiff's protest. Pl. Mem. at 2. The declaration therefore falls within the category of "the record of [a] previous administrative ... proceeding[ ] relating to the procurement," and it may be incorporated into the administrative record. General Order No. 38, Appendix I ¶ 17(u).

■ The court now turns to the materials from the case docketed as No. 00–610 C. That case concerns a separate procurement for training and courseware development in connection with F–117 airplanes. The Guidance on Alternate Proposals (Guidance), which defendant prepared in response to a question from an offeror about the possibility of consolidating the two procurements and which plaintiff seeks to incorporate into the record (an incorporation which defendant does not oppose), states in part that "some efficiencies could easily be realized were the same contractor to perform both requirements." Pl.App. at AR 2769. The Guidance also noted, however, that "parties aren't necessarily interested in combining the solicitations due to several factors including the difference in expertise (weapons systems) required during the source selection, one is an FMS [foreign military sale] requirement, etc." *Id.* The Guidance concluded:

> [W]e are in agreement that some efficiencies could easily be realized were the same contractor to perform both requirements. Contractors are free to propose as they choose in any alternate proposals submit-

ted. If the resultant evaluations, including the evaluations of alternate proposals, realize that the same contractor is going to receive both awards, the government reserves the right to include any efficiencies offered by contractors in their alternate proposal under the individual awards.... Please note, however, that while the offeror may submit the same alternate proposal in response to both solicitations, all offerors are required to separately address the requirements of each individual solicitation in their basic proposal. Separate evaluations are being conducted for each requirement.

*Id.*

The court believes that the Guidance itself supports the exclusion of F–117 procurement materials from the administrative record for this case. The Guidance found, *inter alia,* that the different requirements for the two contracts made it impracticable to combine them, and that the basic proposals were expected to address separately the requirements for each contract. Pl.App. at AR 2769. Since neither plaintiff nor intervenor submitted alternate proposals combining the two contracts, it appears that the information each submitted for each contract was tailored to that contract's individual requirements. Because, according to the Guidance, the evaluations were conducted separately, Pl.App. at AR 2769, the records of the F–117 evaluation are not relevant to the resolution of the protest of the F–4 award. The court's task in this case is to determine whether the decision in the F–4 procurement was supported by the administrative record of · that decision.

For the foregoing reasons, plaintiff's Request for Supplementation of the Administrative Record is GRANTED. Plaintiff's Motion for Leave to Incorporate Protected Material in CFC No. 00–610 C is DENIED.

### III. Discussion

#### A. Summary Judgment

Plaintiff requested a preliminary injunction. The parties have agreed to consolidate the request for an injunction with a final hearing on the merits in order to resolve this matter expeditiously, and have agreed that the merits of the case should be addressed through a summary judgment proceeding. Transcript of October 13, 2000 Status Conference (Conf. Tr.) at 5, 18.

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999). Intervenor and defendant have filed motions for judgment on the administrative record, which are governed by the same rules as motions for summary judgment. RCFC 56.1(a); *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). The question on a motion for judgment on the administrative record is "whether the record substantiates a preponderance of evidence to uphold the procurement decision." *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 393 (1999). It is appropriate to assess a procurement through summary judgment motions and motions for judgment on the administrative record "because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997). Because plaintiff must show that it is likely to prevail on the merits to be granted injunctive relief, *see DSD Laboratories, Inc. v. United States,* 46 Fed.Cl. 467, 480 (2000), the court addresses the merits of the case first.

#### B. Standard of Review

■ The court reviews defendant's source selection decision under the standard set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are "arbitrary, capri-

cious, an abuse of discretion, or otherwise not in accordance with law" or, alternatively, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A),(C). The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law. *GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 779 (1997). Plaintiff argues that defendant's action was arbitrary and capricious. Plaintiff's Motion for Summary Judgment (Pl.Mot.) at 17. Plaintiff also argues that the award decision was inconsistent with applicable regulations. *Id.* at 17.

■ In addition to showing that the agency's action was arbitrary or capricious or otherwise inconsistent with law, a plaintiff in a bid protest action must show that the action was prejudicial. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). To show prejudice, the protestor must demonstrate that there is a reasonable likelihood that, absent the error or violation of law, it would have been awarded the contract. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir. 1999). The agency is entitled to broad discretion in evaluating proposals in a "best value" procurement, such as the one at issue here. *CACI Field Servs., Inc. v. United States*, 13 Cl.Ct. 718, 725, 1987 WL 20532 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988). A court may not "substitute its judgment ... for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States*, 1 Cl.Ct. 662, 664 (1983). If defendant shows that there was a reasoned basis for its decision, the award must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *CRC Marine Servs., Inc. v. United States*, 41 Fed.Cl. 66, 83 (1998). Accordingly, the court reviews defendant's decision to determine whether there was a rational basis for its evaluation and whether the evaluation was consistent with applicable law. If the court finds error, the court then examines whether the error was prejudicial to plaintiff.

### C. Technical Proposals

■ The SSET assigned a risk rating of Moderate to one aspect of plaintiff's technical proposal—the PWM subfactor. AR at 1048. The SSET assigned a Low risk rating to intervenor's technical proposal for the same subfactor. *Id.* at 1046. Plaintiff argues that those evaluations were unreasonable and unsupported by the record, stating that "NLX actually proposed less CAT manpower than did SDS." Pl. Mot. at 20–21. Defendant and intervenor argue that the differing evaluations did reflect a real difference in staffing levels and were therefore reasonable. Defendant's Opposition to Plaintiff's Motion for Summary Judgment and Cross–Motion for Summary Judgment on the Administrative Record (Def.Mot.) at 19–24; Defendant–Intervenor's Motion for Judgment on the Administrative Record and Opposition to Plaintiff's Motion for Summary Judgment at 11–16.

The record establishes that plaintiff proposed three full-time instructors, one part-time instructor who would spend 50% of his time on CAT tasks, and one site manager who would spend 60% of his time on CAT tasks. AR at 791. Plaintiff's proposal therefore provides 4.1 man-years of staffing on CAT tasks. Intervenor proposed four full-time instructors, one part-time instructor who would spend 25% of his time on CAT tasks, and one site manager. *Id.* at 975, 977–78. Intervenor did not make a specific allocation of the site manager's time to CAT tasks. Even if intervenor's site manager's contributions to instructor manning were discounted entirely, intervenor's proposal would still provide a higher level of staffing than plaintiff's—4.25 man-years, rather than 4.1. And, of course, the addition of the site manager increases the difference on an as-needed basis. *Id.* at 910–11. The court does not find irrational the SSET's determination that intervenor's proposal provides more flexibility and therefore warrants a lower risk rat-

ing. Whether the difference warrants the different ratings appears to the court to be within defendant's discretion.

Plaintiff argues that the SSA's finding of an "instructor manning difference of approximately .75 man-year" was unsupported by the record because the SSA "improperly imputed to NLX's proposal SDS's technical approach of using the Site Manager a majority of the time as an instructor." Pl. Mot. at 29 (citing AR at 1038). The court agrees that the source selection document's reference to "instructor manning difference" is ambiguous. The court therefore considers whether this ambiguity supports a finding that the determination was irrational. It is possible that the finding refers to the difference in man-years attributable to instructors other than the site manager, as defendant has argued. Transcript of December 18, 2000 Oral Argument (Oral Arg. Tr.) at 66. It is also possible, as plaintiff has argued, that the SSA was assuming that the site manager would spend approximately 50% of his time on instructional tasks. Id. at 39–40. The court finds nothing improper in either of these possible interpretations, but it is not necessary to confirm either of them. The court notes that defendant had raised a concern to plaintiff earlier in the procurement that assigning too many duties to the site manager would overtask him. AR at 791. Accordingly, the apparent focus by the SSA on the contributions of the instructors rather than the site manager does not appear either inconsistent or unreasonable. It was within the SSA's discretion to conclude, based on the contract's CAT requirements and intervenor's representations about the site manager's duties, that the site manager would spend enough of his time on CAT instruction to yield a difference of roughly .75 man-years. The court also notes that the SSA used the word "approximately" in describing the difference between plaintiff's and intervenor's manning, suggesting that she was merely estimating the man-years afforded by intervenor's staffing proposal. Id. at 1038.

Plaintiff argues that intervenor's site manager should not be regarded as part of the CAT staffing team because intervenor designated the site manager for participation in the program only when another instructor was not present. Pl. Mot. at 21. The record clearly states that intervenor's site manager would be available when another instructor was sick, on vacation, or otherwise unavailable, but does not confine the site manager's availability to those situations. AR at 910–911. The SSA's conclusions regarding intervenor's proposed use of its site manager are not arbitrary, capricious, or inconsistent with intervenor's proposal. Technical ratings involve discretionary determinations by procurement officials and for that reason should not be " 'second guess[ed]' " by courts. *ITT Federal Servs. Corp. v. United States,* 45 Fed.Cl. 174, 188 (1999) (quoting *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 467 (1997)).

Plaintiff also argues that the apparent advantage in CAT staffing is illusory because intervenor required that its full-time instructors spend a significant amount of time on CWD work. Plaintiff's Opposition to United States' and NLX's Cross–Motions for Summary Judgment and Reply to United States' and NLX's Oppositions to Plaintiff's Motion for Summary Judgment (Pl.Opp.) at 8. Plaintiff contends that intervenor did not, in fact, provide more flexibility in CAT staffing because the part-time instructor designed by intervenor to spend 25% of his time on CAT work (the Instructional Developer) had originally been proposed as full-time CWD personnel, and the full-time instructors were required to spend additional time on CWD work to make up for the Instructional Developer's reallocation. Id. But plaintiff's instructors were also assigned both CAT and CWD work, and intervenor's total staffing for CAT and CWD exceeds plaintiff's staffing by a full man-year. *Compare* AR at 791 (six of plaintiff's personnel handling all CAT and CWD tasks) *with* AR at 977–982 (seven of intervenor's personnel handling all CAT and CWD tasks). Plaintiff has not argued, and the court does not find, that intervenor's proposal allocated the share of CAT and CWD tasks among its various personnel improperly.

Plaintiff also argues that the SSA's determination that plaintiff's proposal provided insufficient flexibility in staffing was improper.

Pl. Opp. at 8–9. Here, however, plaintiff simply cites its own proposal and requests that the court find that it was adequate and that the SSA's estimate of the workload was improper. *Id.* The court cannot overturn the SSA's discretionary assessment of the contract's staffing requirement. Plaintiff offers only a conclusory assertion that its own staffing level was appropriate. Plaintiff cannot defeat defendant's and intervenor's motions for judgment on the administrative record with conclusory factual statements. *See Moore U.S.A., Inc. v. Standard Register Co.,* 229 F.3d 1091, 1112 (Fed.Cir.2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").

The SSA also noted that intervenor's "intention to hire a recently retired German Air Force (GAF) officer for Weapons Instructor Course training" was "[a]n additional strength," since it "provide[d] a definite benefit to the training program and [was] a reflection of NLX's in-depth understanding of the GAF environment." AR at 1038. Plaintiff argues that this was "clearly unreasonable," since the site manager that it proposed to hire had been an exchange pilot for the GAF and spoke German fluently. Pl. Opp. at 19. Intervenor's proposed hiring of a retired officer for WIC training and plaintiff's proposed hiring of an exchange pilot as site manager are not on their face equivalent, however, and plaintiff has not shown why the court should view them as equivalent. Plaintiff appears to assume that the strength was due to intervenor's "employment of [a] German speaking instructor," Pl. Opp. at 20, but the SSA did not refer specifically to the officer's ability to speak German as the advantage offered by intervenor's proposal; rather, she referred to intervenor's "in-depth understanding of the GAF environment." AR at 1038. Whether the officer serving as WIC instructor would offer this advantage to the same degree as the pilot serving as site manager was a discretionary determination that this court will not overturn. Moreover, the SSA referred to this aspect of intervenor's proposal as an "additional strength," and devoted only two sentences to this advantage after a lengthy discussion of the staffing differences between intervenor and plaintiff. *Id.* Even assuming, therefore, that the SSA's evaluation of intervenor's proposed hiring of the retired officer as site manager was erroneous, plaintiff has not shown that it was prejudiced by the error, since there were other reasons for the differences between plaintiff's and intervenor's technical ratings.

Plaintiff asserts that "the two proposal[s] are technically equivalent" and that defendant was therefore required to award the contract to plaintiff on account of the lower price of plaintiff's proposal. Pl. Opp. at 19. The record does not, however, support plaintiff's assertion that its proposal was "equivalent" to intervenor's. The court may not overturn the SSA's decision that intervenor's higher level of staffing and higher price represented a more acceptable tradeoff than plaintiff's lower level of staffing and lower price. "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996). The RFP explicitly stated that price was the least important factor for the contracting officer in this proposal, and mission capability (which includes the technical rating that was affected by the respective staffing levels) was one of the two most important. AR at 39. Plaintiff's argument asks the court to substitute its judgment for the SSA's to find that plaintiff's price advantage outweighed intervenor's technical advantage. The court declines to substitute its judgment for the SSA's.

### D. Past Performance

An agency has broad discretion in making past performance evaluations. *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 499 (1999). An agency may consider both relevance and quality of work in evaluating past performance and may give unequal weight to different contracts when the agency views one as more relevant than another. *Id.* The SSET assigned ratings of Very Good in past performance to both plaintiff and intervenor. *Id.* at 1036.

Plaintiff argues that the SSET should not have considered the contracts submitted by intervenor. Pl. Opp. at 10–13.

The RFP's description of the evaluation of offerors' past performance stated that "[p]ast performance will be evaluated by examining four (4) references determined by the Government to be the most recent and relevant in relation to this requirement." AR at 39. The RFP also defines "relevancy" as "courseware development and aircrew training experiences related to Factor 2, Mission Capability, especially those provided to the military." *Id.* Plaintiff argues that this definition does not permit the SSET to consider intervenor's contracts as relevant experience. Pl. Opp. at 10–13.

The RFP directed the SSET to consider the "most recent and relevant" contracts. AR at 39. The RFP also stated that "[e]xperience with aircrew training contracts which utilize the Air Force's model of Instructional Systems Development ... will ... also be viewed favorably." *Id.* at 39–40. Intervenor explained in its description of each of its past Air Force contracts the relevance of intervenor's contributions to ISD work and the extent of intervenor's involvement in ISD management. *See, e.g., id.* at 850–51 (describing intervenor's creation of [ ]); *id.* at 853 (describing intervenor's creation of [ ]); *id.* at 855 (describing intervenor's provision of [ ]). Even though intervenor had no experience in aircrew instruction as such, its ISD experience on contracts involving aircrew training was deemed relevant by the RFP.

While plaintiff's objection to intervenor's past performance evaluation focuses on relevancy, there was more to the past performance evaluation as outlined by the RFP than relevancy as defined by CAT and CWD experience. Specifically, the RFP provided that "the main purpose of the past performance evaluation is to appropriately consider each offeror's demonstrated record of contract compliance by supplying products and services that meet users' needs." AR at 39. The SSET noted that intervenor had "strong management experience on large projects, meeting and beating timelines." *Id.* at 1046. Intervenor's general performance record therefore supported its Very Good rating for past performance.

The contracts that intervenor submitted were not, as plaintiff points out, as apparently relevant as those that plaintiff submitted, since none of them involved CAT or CWD tasks. *See* AR at 1031 ("NLX's contracts deal primarily with maintenance and operation of training devices and associated training."). But the SSA also noted that intervenor's performance was "strong" and that it had shown "expertise" in "large projects meeting and beating timelines." *Id.* The SSA noted that plaintiff's Very Good past performance rating was based on two recent and relevant contracts that included both CAT and CWD work, in one of which "there were difficulties noted in the CWD effort." *Id.* at 1028. While "[c]loser contractor and government attention and continued monitoring [had] overcome most difficulties" on that contract, the SSA also found "some difficulty ... in meeting the phase-in deadline" on the other contract. *Id.* It therefore appears that the clear advantage plaintiff enjoyed in the relevance of its past performance was offset, to some extent at least, by deficiencies in its performance on certain aspects of its relevant contracts. The evaluations of both intervenor's and plaintiff's past performance as Very Good reflects a reasonable comparative evaluation of a highly relevant but not entirely positive performance history and a less relevant but very strong performance history. Such judgments are integral to discretionary decisionmaking. The court does not disturb the SSA's evaluations absent a showing that they were without a rational basis.

The SSA also considered the experience of "key personnel," and stated that "corporate key personnel have extensive experience in the aircrew training arena." *Id.* at 1031. The Federal Acquisition Regulations (FAR) require that a contracting officer consider "key personnel who have relevant experience ... when such information is relevant to the instant acquisition." 48 C.F.R. § 15.305(a)(2)(iii). While intervenor as an entity did not have experience that was directly relevant to the F–4 training, some of its personnel did, and for the SSA to ignore that experience would have violated the terms of the FAR.

Plaintiff argues that the SSA's consideration of the experience of intervenor's key personnel was improper because

the RFP did not "provide[ ] for" such consideration. Oral Arg. Tr. at 22. The court disagrees with plaintiff's interpretation of the RFP. The RFP provides that "[p]ast performance will be evaluated by examining four (4) references determined by the Government to be the most recent and relevant in relation to this requirement." AR at 39. The term "references" does not specifically call for corporate experience as distinguished from experience of key personnel. However, the FAR provides that evaluators "should take into account" the experience of key personnel. 48 C.F.R. § 15.305(a)(2)(iii).[4] Given that procurement officials are usually "given great discretion in determining what references to review in evaluating past performance," *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 567 (2000), the SSA's consideration of the experience of intervenor's key personnel does not appear improper.

In further support of its position, plaintiff cites *ACS Gov't Solutions Group, Inc.*, 1999 WL 397426 (Comp.Gen. Jun.2, 1999), in which GAO overturned an award based in part on the SSA's consideration of key personnel's experience. Pl. Opp. at 13. The solicitation in that case called for "evidence of ... corporate and staff experience," but the award was based "almost entirely" on the experience of key personnel. In fact, GAO found that the agency "did not conduct a separate evaluation of the firm's corporate experience." *ACS*, 1999 WL 397426 at *7. Here, both intervenor's corporate experience with training device contracts and its personnel's aircrew training experience were mentioned in the award, AR at 1031, even though the RFP here did not, as in *ACS*, direct the evaluators to consider corporate and key personnel experience separately. Under the less restrictive terms of this procurement, the *ACS* decision does not provide authority for sustaining the protest.

Plaintiff also argues that the SSA's PER was unsupported because it "relied upon undated and unsigned ratings team worksheets" to reach that conclusion. Pl. Opp. at 11. The RFP directed the SSET to determine which proposal offers the best value to the government and to compile an evaluation report and award recommendation, which "will be used to brief the SSA on the evaluation results." AR at 8. The SSA was directed to make a "comparative assessment of proposals against all criteria" and to include in the decision document the "rationale for any business judgements [sic] and tradeoffs." *Id.* The SSET's "rating team worksheets" that evaluate each aspect of each offeror's proposal, one of which rates intervenor's past performance as Very Good, were attached to

---

4. Plaintiff argues that the absence of any reference to key personnel in the RFP's discussion of past performance evaluation precluded defendant from considering the experience of key personnel in its evaluation. Oral Arg. Tr. at 21–24. In view of the latitude afforded contracting officers in their selection of references to review and evaluate, it is not necessary to decide the point, but the court notes that the law does not appear to be as plaintiff suggests. The FAR provides that contracting officers may deviate from FAR provisions only with authorization from "agency heads or their designees," and that such approval "shall be documented in the contract file." 48 C.F.R. § 1.403. Nothing in the record of this procurement indicates that permission to deviate from the FAR was either sought or granted. It therefore appears to the court that defendant, in preparing the RFP, did not believe that its specifications regarding past performance evaluation were inconsistent with the FAR's guidance that evaluators "should take into account" the experience of key personnel. 48 C.F.R. § 15.305(a)(2)(iii).

Plaintiff also argues that because the Air Force supplement to the FAR did not mention "key personnel" in establishing procedures for considering past performance, defendant was not permitted to consider the experience of key personnel. Oral Arg. Tr. at 92; Air Force Federal Acquisition Regulation Supplement (AFFARS) § 5315.305(a)(2). An agency's supplement to the FAR is not permitted to conflict with the FAR, however, except when authorized. 48 C.F.R. § 1.304(b)(2). A defense agency's deviation from the FAR affecting more than one contracting action must be approved by the head of the agency. 48 C.F.R. § 201.404(b)(ii). Plaintiff has cited no authority, and the court has found none, suggesting that the Air Force or the Department of Defense has approved a deviation from FAR 15.305(a)(2)(iii). It therefore appears to the court that the Air Force did not believe, when it promulgated its regulations with respect to the consideration of offerors' past performance, that those regulations conflicted with the FAR. The Air Force's regulations, which did not preclude the consideration of key personnel, do not appear to the court to be inconsistent with the FAR or the SSA's actions in this procurement.

the PER. *Id.* at 1040–59. The court believes that the SSA's reliance on the SSET's worksheets was consistent with the RFP, since the RFP directs the SSET to make an award recommendation to the SSA. The RFP also directs the SSA to exercise "independent judgment" in making the award decision, but nothing in the record suggests that the SSA in this procurement did not exercise her judgment in assessing the proposals. Nor is it significant that the worksheets evaluating intervenor were undated and unsigned, since none of the evaluation worksheets, including those evaluating plaintiff, were dated or signed. *See, e.g.,* AR at 1048–49 (plaintiff's ratings team worksheet, with no date or signature). Plaintiff asserts that the worksheets evaluating intervenor "purport to conclude that '[e]xperience was found to be both recent and relevant based upon training device contracts and key personnel represented.'" Pl. Opp. at 11 (quoting AR at 1031). However, the worksheet evaluating intervenor says nothing about recency or relevancy. AR at 1056. Rather, it states, under "Strengths," "Company with extensive training devices and associated training" and "Strong management expertise on large projects, meeting and beating timelines, etc." *Id.* It also states, under "Weaknesses," "Have limited CAT experience but propose hiring all incumbent personnel." *Id.* The worksheet therefore draws no conclusions about intervenor's past performance; the conclusions are drawn elsewhere by the SSA. The court does not find that the SSA used the worksheets improperly.

Finally, plaintiff argues that the evaluation of intervenor's past performance as Satisfactory in the F–117 procurement demonstrates that the evaluation in this case was improper. Pl. Opp at 13–15. Plaintiff's argument asks the court to consider the evaluation of intervenor accurate in the other procurement and inaccurate in this procurement. The court does not believe that it should reach that conclusion. The decisions in the two procurements were made separately. AR at 1006. Even where the contracts are similar, two sets of evaluators can reasonably reach different conclusions. *See SRS Technologies,* 1996 WL 112422, *5 n. 4 (Comp.Gen. Mar.1, 1996) ("[T]here is nothing unusual or improp-

er in different evaluators having different perceptions of the merit of a proposed approach, especially where, as here, the work involves different aspects of the program."); *Renic Corp., Gov't Sys. Div.,* 1992 WL 189192, *3 (Comp.Gen. July 29, 1992) ("[E]ach procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement."); *Centex Constr. Co.,* 1990 WL 278107, *4 (Comp.Gen. June 14, 1990) ("[W]e do not find it unusual or improper that different evaluators for different construction projects would have a different perception concerning Centex's quality control plan."). GAO's decisions in similar circumstances are persuasive on this point. Here, intervenor had a strong general record of contract compliance. The RFP directed the SSA to consider offerors' "demonstrated record of contract compliance," together with offerors' more specific record on directly related matters, in evaluating past performance. AR at 39. Based on the terms of the RFP and the facts set forth in the administrative record, the court finds that there was a rational basis for the assignment of a Very Good rating to plaintiff on past performance. The court is not persuaded that the rational basis for the SSA's past performance determination in this procurement should be second-guessed, either because of a different evaluation of intervenor in a separate procurement or for any of the other reasons adduced by plaintiff.

### E. Equal Discussions

Plaintiff also contends that the contracting officer failed to conduct meaningful discussions, in that she did not inform plaintiff that its proposed staffing was insufficient. Pl. Opp. at 16–18. Specifically, plaintiff points out that defendant told intervenor that its "[p]roposed manpower appear[ed] excessive for the total contract effort," AR at 975, but singled out specific staffing problems in plaintiff's proposal rather than making a broader determination. Pl. Opp. at 17.

Meaningful discussions must include sufficient information "that the offerors have a reasonable opportunity to address those areas of weakness which could have a

competitive impact." *Bionetics Corp.*, 1998 WL 951702, *3 (Comp.Gen. Oct.14, 1998). If a contracting officer fails to advise an offeror of material proposal deficiencies, discussions are not meaningful. *See CRAssociates, Inc.*, 2000 WL 365909, *5 (Comp.Gen. Mar.15, 2000). Discussions that "generally lead offerors into the areas of their proposals requiring amplification or correction" are adequate for purposes of the "meaningful discussions" requirement. *Advanced Data Concepts, Inc. v. United States*, 43 Fed.Cl. 410, 422 (1999) (quoting *SRS Techs.*, 1994 WL 576118, *3 (Comp.Gen. Sept.15, 1994)), *aff'd*, 216 F.3d 1054 (Fed.Cir.2000).

Plaintiff's contention that its discussions were not meaningful, in that the plaintiff was not notified of deficiencies in its proposal, appears to conflict with its own revised proposal, which states that it increased its staffing in response to concerns raised by the Air Force. *See* AR at 791 (in response to "ACC [Air Combat Command] manning concerns," stating that "we have revised our core workload manning requirements from a total of 5.5 personnel to 6.0 personnel by adding one-half man-year of I/SME time"). Three of the concerns raised by the contracting officer in discussions with plaintiffs were directly related to the sufficiency of plaintiff's staffing. *See id.* at 788–92. One stated that "[w]e are concerned that the duties [of the site manager as proposed] will over-task this individual," *id.* at 791; the second found more generally that "the other manning proposed does not appear to have enough capacity" to cover both instruction and various other tasks, *id.*; and the third asked whether "the full instructor workload can be accomplished with proposed manpower," *id.* at 792. The court believes that the repeated references to plaintiff's apparent shortcomings in staffing were more than adequate to "lead" plaintiff to defendant's concerns and to permit plaintiff to address those concerns. *See Biospherics, Inc. v. United States*, 48 Fed.Cl. 1, 9 (2000). The contracting officer is not required to identify more particularly than she did here the changes in an offeror's proposal that would permit it to be awarded the contract. *See Labat–Anderson, Inc. v. United States*, 42 Fed.Cl. 806, 835 (1999) ("[A]gencies are not obligated to conduct all-encompassing discussions, that is, to address in express detail all inferior or inadequate aspects of a proposal.") (quoting *CACI Field Servs.*, 13 Cl.Ct. at 731); *DU & Assocs., Inc.*, 1998 WL 892043, *5 (Comp.Gen. Dec.22, 1998) ("[T]he agency is not required to 'spoon-feed' an offeror as to each and every item that could be revised so as to improve its proposal.").

 Plaintiff complains that defendant informed intervenor specifically that its staffing level was too high, with the result that the discussions were not equivalent. Pl. Opp. at 17. However, whether an agency's concerns are couched in general language or as specific concerns is not relevant to the meaningfulness of the discussions, unless one of the offerors is not adequately informed of the deficiencies in its proposal. *Cubic Defense Sys.*, 45 Fed.Cl. at 471 (finding that government's duty to conduct meaningful discussions "goes to the issues, not the specific circumstances that illustrate those issues"); *Speedy Food Service, Inc.*, 1995 WL 317603, *3 (Comp.Gen. May 2, 1995) ("[The offeror] was aware not only of the agency's general concerns about its proposed staffing, but also of the specific discussion questions prepared by the SSEB in this area."); *Techniarts Eng'g*, 1989 WL 240811, *2 (Comp.Gen. June 7, 1989) (sustaining protest on finding that concerns with offeror's proposal "were raised by the agency in a manner that did not give [offeror] notice of the specific areas of its proposal that required improvement or elaboration"). The court notes that, in the cases that have addressed the appropriate level of generality and specificity in the context of meaningful discussions, GAO and this court have more often focused on whether the agency was insufficiently specific than on whether it was too specific. *See, e.g., CACI Field Servs.*, 13 Cl.Ct. at 733; *DU & Assocs.*, 1998 WL 892043, at *5. The court notes plaintiff's concern that defendant did not bring the larger picture to plaintiff's attention, but concludes that the discussions were adequate to apprise plaintiff that defendant considered plaintiff's proposed staffing to be too low, especially since plaintiff did increase its staffing after discussions.

Plaintiff argues that defendant's failure to answer a specific question about plaintiff's manning indicates that the discussions were inadequate. Pl. Opp. at 16–17. The exact text of the question does not appear in the record, but the account of the exchange contained in the administrative record states that "[t]he government refused to provide SDS with a prescribed manning mix." AR at 1011; *see also* Oral Arg. Tr. at 52. Defendant states that the contracts manager interpreted plaintiff's question as requesting that she recommend a particular level of staffing, which she was unwilling to do. Def. Mot. at 30–31. The record indicates that the contracts manager also refused to answer a question from intervenor about its technical proposal: "the government refused to provide NLX Corporation with a prescribed technical approach." AR at 1011. The contracts manager stated that she refused to answer plaintiff's question about staffing and intervenor's question about its technical proposal "for the same reason." *Id.* (explaining that "SDS asked a question concerning its proposed manning mix" and that the agency "refused to provide SDS with a prescribed manning mix for the same reason [it] refused to provide NLX Corporation with a prescribed technical approach"). Most importantly, several of the questions defendant did pose to plaintiff related to staffing. *See* AR at 791–92. That plaintiff increased its staffing level in its revised proposal indicates that plaintiff well understood that its original proposal did not have sufficient staffing. Defendant's questions therefore appear to have given plaintiff adequate notice that defendant considered plaintiff's staffing inadequate, and the fact that defendant declined to answer a particular pointed question could not, in the court's view, have prejudiced plaintiff.

III. Conclusion

The court finds that plaintiff's claims of prejudicial errors in the procurement process are not supported by the administrative record. Since plaintiff does not prevail on the merits, the court does not address plaintiff's request for injunctive relief.

For the foregoing reasons, plaintiff's Motion for Summary Judgment is DENIED, and defendant's and intervenor's motions for judgment on the administrative record are GRANTED.

The court orders the following:

A. The Clerk of the Court is directed to enter judgment for defendant.

B. Each party shall bear its own costs.

C. All filings in this matter shall remain under protective order for three years after the entry of a judgment from which no appeal may be taken or after the expiration of any time for appeal after the entry of judgment, whichever first occurs.

IT IS SO ORDERED.