**FOUR POINTS BY SHERATON,**
Plaintiff,

v.

**UNITED STATES of America, Defendant.**

No. 04–1589C.

United States Court of Federal Claims.

Filed Under Seal June 28, 2005.

Redacted Version filed July 14, 2005.[1]

Angela M. Brown with John D. Pirich, Honigman, Miller, Schwartz and Cohn, LLP, Lansing, Michigan for Plaintiff.

Doris S. Finnerman, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C. for Defendant. Capt. Peter Hartman, Judge Advocate General's Corps, U.S. Army Litigation Center, Arlington, Virginia, Of Counsel for Defendant.

James A. McMillan, Grayson & Kubli, PC, McLean, Virginia for Intervenor.

## ORDER AND OPINION GRANTING DEFENDANT AND INTERVENOR'S CROSS–MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

WILLIAMS, Judge.

In this post-award bid protest, Plaintiff, the Four Points by Sheraton (Four Points),

---

1. This opinion was issued under seal on June 28, 2005. The Court invited the parties to submit proposed redactions by July 6, 2005. Plaintiff did not submit any redactions. The Court accepts the Defendant's and Intervenor's proposed redactions and publishes this opinion *in toto*, correcting errata. Redactions are indicated by brackets "[ ]."

challenges the Army's award of a contract for meals and lodging for armed forces applicants to Command Management Services, Inc. (Command or CMS). Plaintiff contends that the evaluation process was arbitrary and capricious in two respects. First, Plaintiff claims that offers were evaluated unfairly or inconsistently resulting in improper ratings. Second, Plaintiff alleges that the Contracting Officer (CO), Patricia Rollie, was biased against Four Points. Currently before the Court are the parties' cross-motions for judgment on the administrative record (AR).[2] Because Plaintiff has failed to establish that the agency's evaluation and award were arbitrary and capricious or that agency officials were biased against Four Points, Defendant and Intervenor's cross-motions for judgment on the administrative record are granted, and Plaintiff's cross-motion is denied.

### Background

The United States Military Entrance Processing Command (MEPCOM) is responsible for the initial processing of applicants into the armed services of the United States. MEPCOM conducts this processing at Military Entrance Processing Stations in various cities, including Detroit, Michigan. On May 9, 2002, the Army issued solicitation number DABT23–02 for a firm, fixed-price requirements contract to provide meals and lodging for armed forces applicants at the Detroit Military Entrance Processing Station (MEPS). AR 43. The award was for a one-year base contract with four one-year option periods, and was to be based on a best value determination.

The solicitation specified that the proposals would be evaluated according to five criteria: (1) Facility Quality, which included Sanitation and Cleanliness, Room Condition, Meals, Security, Special Features, and Facility Loca-

tion, (2) Transportation, (3) Quality Control, (4) Past Performance, and (5) Cost/Price. AR 54–55. According to the solicitation, facility quality was more important than transportation, and transportation was more important than past performance, which was equal to quality control. Non-cost factors were more important than cost or price. AR 56.

The solicitation included the following classifications for rating the proposals:

Excellent: written proposal demonstrates excellent understanding of requirements and approach that significantly exceeds performance or capability standards. Has exceptional strengths that will significantly benefit the Government. On site evaluation reinforces written proposals.

Good: written proposal demonstrates good understanding of requirements and approach that exceeds performance or capability standards. Has one or more strengths that will benefit the Government. On-site evaluation proves any weakness can be minimized with normal contractor effort and normal Government monitoring.

Satisfactory: written proposal demonstrates basic understanding of requirements and approach that meets performance or capability standards has few strengths. On-site evaluation proves any weakness can be minimized, but confirms the necessity of special contractor emphasis and close government monitoring necessary to minimize difficulties.

Marginal: written proposal demonstrates shallow understanding of requirements and approach that only marginally meets performance or capability standards necessary for minimal contract performance. Has no strengths. On-site evaluation confirms major weaknesses that can cause

---

2. On November 24, 2004, this Court orally granted Plaintiff's request to supplement the AR by taking the deposition of Patricia Rollie, the CO, who was also the source selection authority, for the limited purpose of ascertaining: 1) the basis for her determination that there was a moratorium on issuing both new solicitations and amendments; and 2) the basis for her past performance evaluation of the awardee in July 2003—areas which were not addressed in the AR. The Court also directed Defendant to produce any addition-

al documentation regarding the moratorium as well as three missing evaluations of Four Points and any evaluations of the past performance of Command from January to July 2003. On December 23, 2004, the Court denied Plaintiff's motion to supplement the administrative record with respect to bias, finding that Plaintiff had not made a threshold showing of either motivation or conduct giving rise to a suggestion of bias, sufficient to justify discovery. *Four Points by Sheraton v. United States*, 63 Fed.Cl. 341 (2004).

some disruption of schedule or degradation of performance. Requirements can only be met with major changes to the proposal. Unsatisfactory: written proposal fails to meet performance or capability standards. Requirements can only be met with extensive changes to the proposal. On-site evaluation generally will not be done.

AR 57.

Seven offerors submitted complete proposals. Due to MEPS' funding restraints, the evaluation process was delayed until December 2002. On-site evaluations were conducted on December 11–12, 2002, on the seven properties. On December 16, 2002, Four Points was notified that it was not considered for award because it had not submitted a complete proposal by the due date. AR 244. In response to a protest by Four Points, the Army, on December 19, 2002, issued Amendment 0001, extending the time for best and final offers to December 30, 2002. AR 43. Four Points submitted a complete proposal on December 23, 2002. AR 203.

The evaluators conducted an on-site evaluation of Four Points' property on January 8, 2003. AR 9. On January 22, 2003, the Army notified Four Points that the award was made to Command. AR 229. Four Points filed a protest with the General Accounting Office (GAO) on January 29, 2003. AR 22. On March 19, 2003, Four Points submitted a supplemental protest alleging that Command would be undergoing renovations during 2003. AR 493. In response to this information presented by the protest, the Army determined that it would be proper to reevaluate Command's proposal and conduct another source selection.

On March 27, 2003, the Army notified GAO that it was taking corrective action, which effectively rendered Four Points' protest moot. AR 412. Accordingly, on March 31, 2003, Four Points withdrew its protest. On February 14, 2003, in the intervening period between initial award and Four Points' withdrawal of its protest, Col. David Slotwinski, the commander of MEPCOM, issued a moratorium on new hotel solicitations until a review of the program could be conducted. AR 1177. MEPS officials made it clear to the contracting officer "[t]hat we would stop all awarding of all contracts for meals and lodgings for approximately 90 days." Deposition of Patricia Rollie, Jan. 21, 2005, at 20. On May 12, 2003, the Commander of MEPCOM lifted the moratorium. AR 1178.

Thereafter, on May 20, 2003, the Army issued Amendment 0002 to the RFP with a revised statement of work and set the opening of proposals for May 29, 2003. AR 652. Amendment No. 2 retained the RFP's evaluation factors and the weight assigned to each factor. AR 662. Regarding Transportation, Amendment No. 2 retained the identical language in the original solicitation, which provided that "[t]he offeror shall provide a plan denoting how they will meet the transportation requirements specified in the statement of work. The offeror shall make proposed vehicles available for inspection by the Government." (*Compare* AR 55 with AR 661). The solicitation also mandated:

the contractor shall provide transportation to move applicants from the contractor's facility to the MEPS. The contractor shall transport all applicants from his/her facility to the MEPS each morning so as to arrive at the MEPS site no later than 6:00 AM. The contractor is responsible for transporting the applicants *on time;* however, applicants shall not be awakened any earlier than 30 minutes before breakfast time.

AR 73, 667.

Four Points submitted a revised proposal. AR 652. Command did not. *See* Amendment No. 2 at AR 652 ("Offerors need only to submit revised pricing and/or changes they wish to make to their proposal already on hand."). The Army assigned a team of evaluators to assess proposals, and to make a recommendation to the CO who was also the source selection authority. The evaluations of Command by the on-site evaluators were as follows:

| | Facility Quality | Transportation | Quality Control | Past Performance |
|---|---|---|---|---|
| Gardner | [ ] | [ ] | [ ] | [ ] |
| Walters | [ ] | [ ] | [ ] | [ ] |
| Olson | [ ] | [ ] | [ ] | [ ] |

AR 683–94.

The evaluations of Four Points by the on-site evaluators were as follows:

| | Facility Quality | Transportation | Quality Control | Past Performance |
|---|---|---|---|---|
| Gardner | [ ] | [ ] | [ ] | [ ] |
| Walters | [ ] | [ ] | [ ] | [ ] |
| Olson | [ ] | [ ] | [ ] | [ ] |

AR 278, 707–10, 712–19.

After reviewing the proposals and conducting on-site evaluations, Command was given an all-around rating of [ ], three offerors were rated [ ], Four Points and one other offeror were rated [ ], and two other offerors were rated [ ]. AR 391. Command's price was [ ] and Four Points' price was [ ]. AR 207, 766. On July 9, 2003, the contracting officer prepared written findings that summarized the evaluations of the properties conducted by the three evaluators. With respect to Command, the contracting officer noted that the evaluators had found:

> The Facility quality was rated [ ]. The hotel was extremely attractive and well maintained. Security procedures were first rate. Hotel security personnel were to be present from 10:00 P.M. until 7:00 A.M. weekdays and from 7:00 P.M. until 7:00 A.M. on weekends. They would work in conjunction with CMS security liaison. The hotel security system included a sprinkler system, smoke detectors with battery backup, fire doors that locked at 12:00 A.M. and an evacuation plan posted inside every room. The main lobby was clean, large, decorated and presented a welcome atmosphere. Approximately 80% of the Hilton has been designated as being smoke-free. The transportation proposal was [ ]. Transportation is being subcontracted to a transportation company. CMS orders the number of buses necessary for all applicants to travel and arrive at MEPS no later than 0530. The hotel has its own 8–seat shuttle for guest use. The hotel is 2.5 miles from the front entrance of the MEPS. The dining area of the hotel is more than adequate to meet applicant needs. Applicants are provided with regular menus for ordering evening meals. The kitchen was impeccably clean and orderly, and the temperature logs on the refrigerators and freezers were maintained and up to date. Thermometers were visible on all units, items inside were covered and dated appropriately. Dry food storage was separate and maintained well above standards. All kitchen workers wore hats and gloves in the food preparation area. No janitorial or disposal areas were noted in the food preparation area. Quality control was [ ]. Inspections met the general cleaning and deep cleaning requirements. According to kitchen staff, deep cleaning is accomplished on a quarterly basis. No kitchen hazards were identified. Hand washing signs were posted in the kitchen. Quality control was [ ]. The guest rooms were well maintained. The random selection of rooms showed impeccable cleaning and high quality standards. No deficiencies were noted. Room renovations were completed in 1998. Room furniture is in excellent condition. The hotel offers video games, a year round pool, dry saunas and locker rooms with showers. The pool depth is 6 feet and CMS staff will check the pool once every hour. The applicant lounge can comfortably hold 50 people. The lounge will also serve as the check-in area for MEPS applicants. The lounge has been outfitted with a big-screen television for watching movies, a separate television equipped with a PlayStation, numerous board games, free soda and snacks. The facility has received the Hilton Pride Award, and its staff has also received several personal service awards to staff members. Several key hotel staff members have been with the facility for 20–plus years. The overflow hotel is close and convenient. The hotel planned to renovate the pool, fitness room and dining room beginning in May 2003 and scheduled to be completed by June 2003. There is no indication that the renovations will have any significant impact upon the contractor's ability to meet the Government's requirements. Renovations on a 5 to 10 year cycle are typical in the hotel industry. Past performance was [ ]. CMS has [ ] past performance. They currently hold several meals & lodging contracts throughout the United States and several transportation and food service contracts for other Military Installations, all with [ ] past performance.

AR 761–62.

With respect to Four Points, the contracting officer made the following written summary of the evaluators findings:

The facility quality is [ ]. The facility houses adequate lounge area with seating for 25. The lounge area has a 15″ to 20″ television. The pool and exercise areas are very clean. The entrance and overall hotel was renovated in September of 2002, resulting in a beautification certificate for appearance from the City of Warren. The overflow hotel is close and convenient. The security system monitors the main entrance and second floor of the hotel. The second floor is where male applicants are housed. The system is monitored 24-hours a day at the front desk of facility. After 12:00 a.m., guest access is through the front door only. The fire system was upgraded with sprinkler systems through the hallways and in individual rooms. The fire system is monitored at the front desk of hotel. Smoke detectors do not have a battery back up. If power failure occurs, a generator back up provides adequate power to the hotel. Rooms are clean. However, some stains were found on sheets and mattresses. Rooms are 70/30 smoking. Currently, applicants eat only in the lounge area. The transportation proposal was considered [ ]. Although Four Points proposed to purchase two new vans, it proposed to transport the applicants in a possible series of transportation rides so that the applicants would be arriving at different times in the morning. Departure from the hotel realistically should not be earlier than 0530 so as to allow sufficient time for breakfast for the applicants. Four Points is 12 miles from the MEPS. Per the statement of work, arrival at the MEPS must occur by 0600. More than one trip to transport applicants would cause the second group to arrive after 0600. Further, the MEPS prefer that the applicants arrive at the station in one trip at the same time so as to facilitate processing. Four Points provided their current vans for inspection. It [sic] consists of two fifteen-passenger vans in which seat belts are tucked away making it difficult to buckle up and one van had a broken seat belt in the rear seating section. The MEPS evaluation team observed questionable tread on front tires of one van. The quality control was considered [ ]. The kitchen health codes were up to date. The kitchen is small but relatively clean. However, it was observed that there was no posting of hand washing signs. One committee member observed an unwrapped and uncovered large piece of meat in an uncovered pan on the floor of the walk-in freezer. An uncovered glazing substance was observed in the kitchen area. Also a ladle was found in a spaghetti container in the walk-in freezer. The dishwasher area appeared dirty and unkempt. The written proposal states "meals are prepared and served on the premises in the hotel restaurant, Picasso's"; however, applicants are not allowed to eat in the restaurant but rather in the applicant lounge. Past performance is [ ]. Four Points has held the MEPS contract for 6 years. For the year 2000, the former Ramada Inn, Warren (former name of Four Points prior to renovation), received [ ] and [ ] monthly hotel inspections for January through October, and for December. For the year 2001, the former Ramada Inn, Warren, received [ ] monthly hotel inspections for January through March, for May, and for August through October. For the year 2002, the former Ramada Inn, Warren, received [ ] monthly hotel inspections for March and for minor [ ] in December 2002. The majority of the [ ] ratings consisted of repeated late vehicle arrivals for morning transport to the MEPS and repeated hotel kitchen [ ].

AR 763–64. Although Four Points' price was [ ] than Command's, the Army determined that Command represented the best value for the Government. AR 766. In reaching that determination, the CO concluded:

Offeror 7 [Command] represents the best value selection for the Government. The proposal and on-site evaluation of Offeror 7 was [sic] [ ]. The facility was extremely attractive and well maintained. It proposed a contract liaison to be exclusively used in assisting applicants and monitoring their activities. Such designated persons will assist the MEPS in ensuring that applicants are properly rested when they

arrive at the MEPS for testing or shipping, coordination is maintained between the hotel and the MEPS for the arrival and departure of applicants. Offeror 7 also proposed recreational activities and facilities with the hotel facility specially designed for the enjoyment of the applicants. The security is [ ] and should function well. The layout of the hotel and the presence of security liaison and security cameras indicate that security for the applicants will be high and consistent. The facility is centrally located and easily accessible for recruiters and applicants. The facility and the rooms were very attractive. The kitchen and dining rooms are very attractive, clean and well maintained. CMS has a vast knowledge of dealing with applicants and has an [ ] past performance. Selection of this offeror ensures that MEPCOM's "Red Carpet" treatment of the applicants is maintained. Applicants who are treated well and housed in nicer facilities are more likely to have a favorable impression of military service and thus, more likely to join the military and actually ship for training. For reasons stated above, Offeror 7 represents the best value for the Government.

AR 767.

Four Points protested the award to Command at GAO on July 18, 2003. AR 412. Plaintiff alleged that the Army took an excessive and unreasonable amount of time to take corrective action after its initial protest to allow Command to complete its renovation. Essentially, Plaintiff averred that the Government issued a moratorium on all MEPS meals and lodging contracts, which was not lifted until Command finished its renovations, to ensure that Command could finish its renovation before the re-solicitation. With respect to this allegation, GAO found that the February 14, 2003, email, which placed a moratorium on all MEPS meals and lodging

requirements, was finally lifted on May 12, 2003—8 days before Amendment No. 2 which extended the closing date for receipt of proposals until May 29, enabling the agency to go forward with award. AR 1190. GAO dismissed this allegation, noting that Government officials are presumed to act in good faith. *Id.*

Moreover, in its protest at GAO, Plaintiff alleged that "the contracting officer was determined to ensure that its hotel was not considered for the award and that Command would receive the award." AR 1191. Plaintiff also alleged bias against the manager of its hotel because of his national origin. AR 1191. GAO dismissed these protest grounds for lack of support and ruled that the Army's apparent failure to advise Plaintiff of the moratorium did not provide any reason to question the delay in taking corrective action.[3] AR 1190.

### *Discussion*

#### *Standing*[4]

At the outset, Defendant and Intervenor argue that Plaintiff does not have standing to pursue this protest. Because standing is a threshold jurisdictional issue, the Court will address Four Points' standing before reaching the merits. *See Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002) ("Like mootness, standing is a threshold jurisdictional issue."); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1032–33 (Fed.Cir.1995); *Eagle Design & Mgmt. v. United States,* 62 Fed.Cl. 106, 108 (2004).

■ The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), gives this Court jurisdiction in bid protest actions brought by an "interested party" objecting to a solicitation or to a proposed award or award of a contract. 28 U.S.C. § 1491(b)(1). The Federal Circuit

---

3. Plaintiff also alleged that its proposal was improperly downgraded under the facility quality factor, that the Army failed to take account of Plaintiff's planned purchase of two new vans and that the Army failed to consider special features that it offered under the facility quality factor. GAO dismissed these protest grounds as untimely. *Id.* at 1189.

4. At oral argument, Plaintiff requested leave to address the Government's argument regarding standing, and Defendant and Intervenor sought leave to further brief the issue. Tr. at 71–72. On May 2, 2005, the parties and intervenor provided supplemental briefing on the issue.

has construed "interested party" under ADRA to comport with "interested party" as defined in the Competition in Contracting Act (CICA), 31 U.S.C. § 3551.[5] *See Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1352 (Fed.Cir.2004). CICA defines an "interested party" as an "actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or failure to award the contract." 31 U.S.C. § 3551(2). Thus, standing in this court under the ADRA is "limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Banknote Corp.,* 365 F.3d at 1352 (internal citation omitted). Our appellate authority has required disappointed bidders to allege that they would be prejudiced by the agency action in order to establish standing and status as an interested party. *See Information, Technology and Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir. 2003) (*ITAC II*) ("because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits").

 In order to establish standing, a potential bidder must allege that it would have a substantial chance of securing the award absent the procurement error being challenged. *Myers,* 275 F.3d at 1369. Plaintiff asserts that it was deprived of an opportunity to compete on an even playing field because the evaluation process was improper, its ratings were erroneous, and the CO was biased against it.

If the Court were to accept Plaintiff's argument and conclude that the evaluators and the CO acted arbitrarily and capriciously or were biased against Four Points in evaluating its proposal, it could declare the current ratings invalid and order a re-evaluation. In such a case, and in the absence of the alleged bias, Plaintiff could have a substantial chance of securing award on a level playing field. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1334 (Fed.Cir.2001) ("if appellant's bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and appellant could compete for the contract once again. Under these circumstances, the appellant has a 'substantial chance' of receiving the award and an economic interest and has standing to challenge the award."). As such, Four Points has standing to pursue this protest.

***Standard of Review***

In a bid protest action, the Court reviews the defendant's decision under the standards in the Administrative Procedure Act (APA), 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). Pursuant to the APA, a reviewing court is directed to overturn agency actions that are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

To prevail in a bid protest, "[t]he protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law." *Gentex Corp. v. United States,* 58 Fed.Cl. 634, 648 (2003) (citing *Information, Technology and Applications Corp. v. United States,* 51 Fed.Cl. 340 (2001)) (*ITAC*) (citing *GraphicData LLC v. United States,* 37 Fed.Cl. 771, 779 (1997)), *aff'd,* 316 F.3d 1312 (Fed.Cir.2003). "If the court finds that the Government's conduct fails the APA review under 5 U.S.C. § 706(2)(a), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed. Cir.2005); *see Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996) (holding that to prevail in the protest, the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it); *Gentex,* 58 Fed.Cl. at 648. For the protestor to demonstrate that it was prejudiced, it must show "that there was a substantial chance it would have received the contract but for that error." *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996).

---

5. CICA provides bid protest jurisdiction to the GAO.

### *Plaintiff has Failed to Demonstrate that the Evaluation was Arbitrary and Capricious*

■ Plaintiff's manifold scattershot challenges to this award fall into two categories: its disagreement with evaluators' ratings and conclusions and its bald allegation of bias. Plaintiff has an uphill battle on both fronts. Where, as here, the solicitation contemplated award on a "best value" basis, the burden on the protester to demonstrate that the decision was arbitrary and capricious is elevated. *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1330 (Fed.Cir.2004). This is because " '[t]he greater the discretion granted to a contracting officer, the more difficult it will be to prove the decision was arbitrary and capricious.' " *Galen,* 369 F.3d at 1330 (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980)); *see E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) ("[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government"). Therefore, " '[w]here an evaluation is challenged, [the court] will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.' " *Galen,* 369 F.3d at 1330 (internal citation omitted).

### *Plaintiff's Disagreement With Ratings*

■ Absent error or illegal conduct, this court will not second guess the agency's assessment of the comparative merits of proposals, a matter which is entrusted to administrative discretion in a best value procurement. *Galen,* 369 F.3d at 1330.

1) *Four Points' [ ] Rating on Monthly Inspections*

Plaintiff criticizes the CO's evaluation of Four Points as "[ ] on prior monthly inspections," because the CO does not explain which inspections were involved or adequately articulate the reasons for this assertion. Pl.'s Br. at 22. However, the findings of the CO make this clear:

Four Points has held the MEPS contract for 6 years. For the year 2000, the former Ramada Inn, Warren (former name of Four Points prior to renovation), received [ ] and [ ] monthly hotel inspections for January through October, and for December. For the year 2001, the former Ramada Inn, Warren, received [ ] monthly hotel inspections for January through March, for May, and for August through October. For the year 2002, the former Ramada Inn, Warren, received [ ] monthly hotel inspections for March and for minor [ ] in December 2002. The majority of the [ ] ratings consisted of repeated late vehicle arrivals for morning transport to the MEPS and repeated hotel kitchen [ ].

AR 764; see also, Kirby S. Olson (Olson Decl.) (April 28, 2005) at ¶ 3.

2) *Command's [ ] Rating For Facility Quality*

Plaintiff criticizes an evaluator for giving Command an [ ] rating for "facility quality" despite the fact that Command did not have a game room or weight room. However, a game room was not required in the solicitation, and that same evaluator noted that Command had a contract with a nearby fitness facility and considered the condition of the rooms, the presence of a pool and sauna, and the security in the hotel in formulating this rating.

3) *Four Points' [ ] Rating for Facility Quality*

Plaintiff broadly complains that evaluator Gardner gave it only a [ ] rating for facility and quality, without a "single legitimate criticism." Pl.'s Br. at 2. However, evaluator Gardner criticized Four Points on several counts—that there was excessive heat in the exercise room, that applicants were served both meals in a designated room instead of the hotel's regular restaurant, that the lounge had only 24 chairs, that the television was not of sufficient size, and that the

hotel was 10 miles from the MEPS.[6] When considered in the aggregate, this evaluator's determination that these criticisms warranted a [ ] rating was reasonable.

### Improper Reliance on the. Site Evaluation

Plaintiff asserts that the "Government unduly relied on written proposals in the re-evaluation process, when it was very clear during the first evaluation that the on-site evaluations were all that mattered." Tr. at 4 (April 18, 2005). However, Plaintiff admitted that the solicitation did not actually say that site evaluations were all that mattered. Tr. at 5. Further, the solicitation addressed the role of on-site evaluations in the context of adjectival ratings. For example, for an excellent rating, an evaluator would have to conclude: "on-site evaluation reinforces written proposals" or for a good rating, "on-site evaluation proves any weakness can be minimized with normal contractor effort and normal Government monitoring." AR 57. There is no evidence that the Government improperly weighed the written evaluation vis-a-vis the site visit.

### Plaintiff's Contention that its Security Was Superior

Four Points contends that it had "superior security" to that of Command. However, this is not borne out by the record. Command's security was described by the CO as follows:

> Security procedures were [ ]. Hotel security personnel were to be present from 10:00 P.M. until 7:00 A.M. weekdays and from 7:00 P.M. until 7:00 A.M. on weekends. They would work in conjunction with CMS security liaison. The hotel security system included a sprinkler system, smoke detectors with battery backup, fire doors that locked at 12:00 A.M. and an evacuation plan posted inside every room.

AR 761.

In contrast, Four Points' security was described as follows:

> The security system monitors the main entrance and second floor of the hotel. The second floor is where male applicants are housed. The system is monitored 24–hours a day at the front desk of facility. After 12:00 a.m., guest access is through the front door only. The fire system was upgraded with sprinkler systems through the hallways and in individual rooms. The fire system is monitored at the front desk of hotel. Smoke detectors do not have a battery back up. If power failure occurs, a generator back up provides adequate power to the hotel.

AR 763–764.

Plaintiff's disagreement with subjective evaluations, in the absence of evidence, does not demonstrate that the award was arbitrary and capricious.[7] *Galen,* 369 F.3d at 1330 (" ' . . . the relative merit of competing proposals is primarily a matter of administrative discretion' " (internal citation omitted)).

### Transportation

Plaintiff alleges that evaluators erred or were arbitrary in their relative assessment of offerors' transportation capabilities. However, the record is devoid of support for this allegation. According to the CO

> [Four Points'] transportation proposal was considered [ ]. Although Four Points proposed to purchase two new vans, it proposed to transport the applicants in a possible series of transportation rides so that the applicants would be arriving at different times in the morning. Departure from the hotel realistically should not be earlier than 0530 so as to allow sufficient time for breakfast for the applicants. Four Points is 12 miles from the MEPS. Per the statement of work, arrival at the MEPS must occur by 0600. More than one trip to transport applicants would cause the second group to arrive after 0600. Further, the MEPS prefer that the

---

**6.** Plaintiff also challenges one evaluator's [ ] rating of Four Points' "Facility Quality" due to his interpretation of Plaintiff's owner's comment about finding adult magazines under the beds during room inspections. Even accepting that this evaluator misunderstood the owner's remark, this does not establish that the evaluation as a whole, which considered numerous other factors, was irrational or unreasonable. AR 707.

**7.** During oral argument counsel admitted that two different evaluators had different subjective impressions with respect to security. Tr. at 11–15.

applicants arrive at the station in one trip at the same time so as to facilitate processing. Four Points provided their current vans for inspection. It consists of two fifteen-passenger vans in which seat belts are tucked away making it difficult to buckle up and one van had a broken seat belt in the rear seating section. The MEPS evaluation team observed questionable tread on front tires of one van.

AR 764.

To the contrary, the CO noted that Command's transportation

[ ] CMS [ ] for all applicants to travel and arrive at MEPS no later than 0530. The hotel has its own 8-seat shuttle for guest use. The hotel is 2.5 miles from the front entrance of the MEPS.

AR 761.

Plaintiff alleges that "[a]ll CMS sponsored transportation plans were taken at face value and without inspecting the proposed vehicles, while Four Point's representations were not taken at face value and its vehicles that it used under the [prior] low-bid contract (and that were not proposed to be used for the new contract) were inspected and highly criticized." Pl.'s Suppl. Br. at 4. However, the solicitation put offerors on notice that their proposed vehicles had to be made available for inspection, and the record indicates that Four Points itself offered its current vans for inspection. AR 55; Tr. at 30–34 discussing AR 661. Similarly, Plaintiff recognizes that the awardee's facility was only 2.5 miles away from MEPS, while its facility was 10 miles away. Nonetheless, Plaintiff argues that its 10–mile distance should not have been deemed a weakness when it was within the parameters in the solicitation. Further, Plaintiff suggests that other offerors whose facilities were 12 miles away were not deemed weak in this regard, but fails to acknowledge other considerations underlying these ratings. Tr. at 29. Such bare allega-

tions of disparate treatment fall short of the mark. As this court has noted:

> Plaintiff offers little more than mere disagreements with the contracting officer's assessment of the adequacy of its oral presentation. 'Such naked claims,' this court has stated, 'by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious.'

*EP Prods. v. United States,* 63 Fed.Cl. 220, 226 (2004) (citing *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 660 (2002)); *see Indus. Prop. Mgmt., Inc. v. United States,* 59 Fed.Cl. 318, 323 (2004) (" '[t]he fact that [plaintiff] disagrees with the evaluator's conclusions is not enough for this court to overturn them.' ") (citing *Fru–Con Construction, Inc. v. United States,* 57 Fed.Cl. 483, 484–85 (2003)). In short, Plaintiff has not demonstrated that the evaluators' relative assessment of transportation and distance was arbitrary and capricious, or irrational.

### The Army's Alleged Failure to Consider Four Points' Attributes

Plaintiff's allegation that the evaluators failed to properly consider Four Points's track record as the incumbent also fails. Plaintiff lists numerous qualities including recreational facilities, capacity and special accommodations that "should" have been considered by the evaluators, but fails to demonstrate that such factors were not taken into account. Pl.'s Br. at 21. Past performance was taken into consideration by the three evaluators, and this Court cannot conclude that the positive aspects of Four Points' previous performance was not sufficiently weighed or that they warranted a higher rating.[8]

### Bias [9]

 Where, as here, Plaintiff has alleged bad faith on the part of the contracting offi-

---

8. Plaintiff's other challenges to the evaluators' ratings and decisionmaking are of the same ilk and suffer from the same absence of proof. As GAO stated in its well-reasoned decision: "[w]hile the protester believes that the contracting officer 'was determined to ensure that Four Points was not considered for award,' we are not

prepared to delve further into the allegation without some concrete support for this allegation." AR 1191.

9. Initially in its complaint and GAO protest, Four Points alleged that Hani Mio, the general manager and part owner of Four Points, was "born in

cer in order to "'overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable.'" *Galen,* 369 F.3d at 1330 (citing *ITAC II,* 316 F.3d at 1323 n. 2). The Federal Circuit has equated "almost irrefragable proof" with clear and convincing evidence. *See Galen,* 369 F.3d at 1330; *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed.Cir.2002). Thus, in cases where courts consider "allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Galen,* 369 F.3d at 1330 (internal citations omitted). Plaintiff has added nothing to its prior allegation that Ms. Rollie's conduct in 2002, regarding its submission of a proposal amounted to bias.[10] Plaintiff has attempted to show bias based upon inconsistent or wrong evaluations—allegations which this Court determined were too vague and unsupported to warrant discovery. This court found:

> Like the appellant in *ITAC,* Four Points alleges that the evaluators and the contracting officer were biased against Four Points, but the sole basis for this contention is its disagreement with their evaluation of Four Points and Command. Plaintiff's Supp. Br. at 11. Here, there is no alleged conduct which might indicate a motivation for bias on the part of the CO or the evaluators. Criticism of Plaintiff's performance on the incumbent contract in areas required to be evaluated or erroneous evaluations or inconsistent scoring do not rise to the level of motivation for bias. Rather, the numerous examples cited by Plaintiff to support its need to probe bias in discovery are judgmental conclusions of

the CO or the evaluators which are part and parcel of the evaluation itself and capable of challenge in a bid protest in and of themselves. Nor was there alleged conduct by these individuals which was difficult to explain, absent bias. *See Beta [Analytics International Inc. v. U.S.],* 61 Fed. Cl. [223] at 226 [(2004)]. In short, there is an insufficient basis here for permitting inquiry into the alleged bias of these Government officials.

*Four Points,* 63 Fed.Cl. at 344–45. Plaintiff's unsupported reassertion of bias without record support is summarily denied.

### Permanent Injunction

To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. *See Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (2000); *see also Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) *aff'd,* 10 Fed.Appx. 957 (Fed.Cir.2001). Because Plaintiff has not succeeded on the merits, there is no basis for entering a permanent injunction. *See Bean Stuyvesant,* 48 Fed.Cl. at 320–21 (holding that there must be actual success on the merits to succeed in a request for a permanent injunction).

### Conclusion

1. Defendant and Intervenor's cross-motions for judgment on the administrative record are **GRANTED.** Plaintiff's motion for judgment on the administrative record is **DENIED.** No costs.

---

Bagdad, Iraq and is Chalden–American." AR 1194; Complaint ¶ 55. Plaintiff continued: "The Army seems determined to do whatever is necessary to award this contract to a bidder other than Four Points possibly because of Mio's national origin." *Id.* However, Plaintiff made no mention of Mr. Mio's national origin in its pending motion papers and appears to have abandoned that ground for claiming bias.

10. Plaintiff reasserts arguments that Ms. Rollie misled it by indicating its proposal had been rejected "knowing that there would be more time and that she had promised to address any deficiencies with Four Points." Pl.'s Br. at 9. Any ill

effects resulting from this conduct were cured. Subsequent to this, Four Points was permitted by a different contracting official, the Directorate of Contracting, to submit a supplemental proposal and fully participate in the competition. Again, Plaintiff has failed to demonstrate that conduct of Ms. Rollie prior to the submission of its offer demonstrated bias or prejudiced it. The record supports GAO's conclusion: "Four Points also alleges that the contracting officer was determined to ensure that its hotel was not considered for the award and that CMS would receive the award. Four Points provides no probative evidence to support this contention." AR 1191.

2. The parties shall file proposed redactions to this opinion by **July 6, 2005**.