**PLASAN NORTH AMERICA, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**BAE Systems Aerospace and Defense Group Inc., Intervenor.**

**No. 12–779C**

United States Court of Federal Claims.

(Originally Filed Under Seal February 21, 2013)

(Reissued March 11, 2013)

---

James J. Briody, Sutherland Asbill and Brennan LLP, Washington, D.C., attorney of record for plaintiff, and Jeffrey P. Bialos and Scott A. Killian, of counsel.

Elizabeth Anne Speck, Department of Justice, Civil Division, Washington, D.C., with whom was Principal Deputy Assistant Attorney General Stuart F. Delery, for Defendant. Jeanne M. Davidson, Director and Reginald T. Blades, Jr., Assistant Director.

Barbara A. Duncombe, Taft Stettinius & Hollister LLP, Dayton, Ohio, attorney of record for Defendant–Intervenor, and Suzanne Sumner, Tricia Bell, Casie E. Hollis and Joshua D. Prentice, of counsel.

Futey, Judge.

**Post Award Bid Protest; Standing; Review of Agency Decision; Past Performance; Best Value Determination; Showing of Bias**

*OPINION & ORDER*

This is a post-award bid protest concerning the Defense Logistics Agency's ("DLA") negotiated procurement for Enhanced Small Arm Protective Inserts ("ESAPI") body armor. After an initial protest at the GAO and corrective action, DLA again awarded the contract to BAE Systems Aerospace and Defense Group, Inc. ("BAE") on September 17, 2012. Disappointed bidder Plasan North America, Inc. ("Plasan") filed its protest in this Court on November 16, 2012, and BAE intervened.

In essence, Plasan argues that DLA's decision to award to BAE was arbitrary and capricious based on an unreasonable evaluation of the past performance factor, an improper best value tradeoff not in accord with the solicitation, and biased evaluators who attempted to "whitewash" BAE's past performance record. Plasan seeks to enjoin DLA's award to BAE. The Government in DLA's defense argues that Plasan's protest is merely an attempt to second-guess DLA's decision, which was reasonable and well-documented.

The parties have cross-moved for Judgment on the Administrative Record pursuant to U.S. Court of Federal Claims Rule ("RCFC") 52.1, and briefed their arguments. The Court held oral arguments on January 30, 2013. On February 11, 2013, Plasan filed

its "Motion To Strike Inaccurate Statements Made During Defendant–Intervenor's Oral Argument." Intervenor responded on February 13, 2013, and Defendant responded on February 15, 2013. Plasan filed a reply brief on February 20, 2013.

I. Background
 A. Solicitation

On January 14, 2011, DLA issued Solicitation No. SPM1C1–10–R–0151, seeking proposals for the acquisition of ESAPI body armor. Admin. R. ("AR") 58–112. The Solicitation provided for an indefinite-delivery, indefinite-quantity contract, and was divided into three separate and distinct portions to result in three separate awards. AR 64–72. To ensure multiple sources and continuous availability of reliable sources of supply, awardees selected for earlier portions would be eliminated from competition for the later portions. AR 64; Federal Acquisition Regulation ("FAR") § 6.202(a)(4). Portion 1 was solicited on an Unrestricted basis for 50% of the total annual estimated quantity. AR 65–66. Portion 2 was also solicited on an Unrestricted basis, and represented 30% of the quantity, and Portion 3 was solicited as a small business set-aside for the remaining 20% of the total quantity.[1] AR 67–70. Portions 3 and 4 have been cancelled. AR 3 n.2. This protest concerns Portion 2. AR 281.

The solicitation for Portion 2 sets forth a base year and two option years, with a minimum quantity of 22,500 ESAPIs, 99,000 annual estimated quantity, and 180,000 maximum quantity. AR 67. Section M contained Clause 52.215–9P17, "Evaluation Factors For Award," which stated that:

The Government will make award to the responsible offeror(s) whose offer conforms with the solicitation and is most advantageous to the Government, cost or price, and other evaluation factors considered ... For this solicitation, all evaluation factors other than cost or price, when combined, are—significantly more important than cost or price. As other evaluation factors become more equal, the evaluated cost or price becomes more important.

1. The solicitation also included a Portion 4 to be awarded on an Unrestricted basis, in the event

an award for Portion 3 could not be made to a small business concern. AR 71–72.

AR. 109. Section M also listed the Non–Cost/Price evaluation factors: (1) Passing Ballistics Results, (2) Past Performance/Experience, and (3) Socioeconomic Support. *Id.* The first factor, Passing Ballistics Results was a mandatory requirement in accordance with First Article Test ("FAT") criteria. *Id.* Offerors would be evaluated on a pass/fail basis, and contractors failing this factor would have their entire proposal rejected. AR 110. Contractors that did pass would be further evaluated under the remaining evaluation factors. *Id.* Factors (2) and (3) were listed in decreasing order of importance. AR 109.

Factor Two, Past Performance/Experience listed three sub-factors: (a) Experience, (b) Quality of Items/Delivery Performance, and (c) Compliance with Socioeconomic Subcontracting/Mentoring Goals. AR 109. DLA would assess both offeror-submitted information, as well as relevant information from any other sources for the period two years prior to the original solicitation closing date as indicators of contract success. AR 110. The agency would also consider currency and relevance of the information, source, context of the data, volume of business, and general trends in performance. *Id.* The Solicitation stated that sub-factors (a) and (b) were of equal importance, and more important than sub-factor (c). AR 109.

The Experience sub-factor asked offerors to describe the extent of their experience producing the same or similar item(s), including information such as contract and order numbers, dates, points of contact, total quantities, and quantities shipped per month. AR 102. The Quality of Items/Delivery Performance sub-factor required offerors to elaborate on the contracts identified in response to sub-factor (a), and provide a description of the quality of items delivered, an explanation for any quality issues that arose, whether items were delivered on time, and any explanation for late deliveries. AR 102–03. The final sub-factor, Compliance with Contractual Socioeconomic Subcontracting/Mentoring Goals, required a description of compliance with goals for subcontracting to various small business concerns, and compared planned

performance and actual performance by business category. AR 103.

The Past Performance/Experience evaluation sub-factors would be rated via an "Adjective Rating Symbology" which included the ratings "Exceptional," "Very Good," "Satisfactory," "Marginal," and "Unsatisfactory," and set forth descriptions and qualities of each. AR 111–12. The agency twice amended the ratings, first to incorporate that offerors demonstrate an ability to produce items at the relevant quantities, as expressed in FAR Clause 52.216–19 "Order Limitations," AR 116–118, and again to add language to the adjectival descriptions, AR 121–22. For Portion 2, 19,950 ESAPIs per month was the relevant quantity production criterion. AR 92, 116–118. The relevant adjectival ratings to this protest are:

**Very Good**

*Past Performance/Experience*: Past performance (for quality of product/service, workmanship, delivery, and if an unrestricted acquisition, contractual socioeconomic subcontracting and mentoring goals) meets contractual requirements and exceeds some to the Government's benefit. Contractual performance is accomplished with some minor problems for which corrective actions taken by the offeror were effective. The offeror has experience with items/services of a similar kind and complexity to the solicited items/services at quantities similar to the maximum monthly quantities set forth in Clause 52.216–19 on pg 35 of this solicitation. Experience is on commercial or government contracts.

An overall rating of this magnitude indicates an understanding of the technical requirements and an ability to provide an acceptable quality product/service with a very good probability of successful contract performance.

**Satisfactory**

*Past Performance/Experience*: Past performance (for quality of product/service, workmanship, delivery, and if an unrestricted acquisition, contractual socioeconomic subcontracting and mentoring goals) meets contractual requirements. Contractual performance includes some minor problems for which corrective actions tak-

en by the offeror appear or were satisfactory. The offeror has some experience with items/services of a similar kind and complexity to the solicited items/services at or below quantities similar to the maximum monthly quantities set forth in Clause 52.216–19 on pg 35 of this solicitation. Experience is on commercial or government contracts.

An overall rating of this magnitude indicates an understanding of the technical requirements and an ability to provide an acceptable quality product/service with a reasonable probability of successful contract performance.

**Marginal**

*Past Performance/Experience*: Past performance (for quality of product/service, workmanship, delivery, and if an unrestricted acquisition, contractual socioeconomic subcontracting and mentoring goals) does not meet some contractual requirements. Contractual performance contains serious problem(s) for which the offeror's corrective actions appear only marginally effective or were not fully implemented. The offeror has little experience with items/services of a lesser kind and complexity to the solicited items/services at or below quantities similar to the maximum monthly quantities set forth in Clause 52.216–19 on pg 35 of this solicitation. Experience is on commercial or government contracts.

An overall rating of this magnitude indicates a marginal quality of product/service and a questionable probability of successful contract performance.

AR 121–22.

The final and least important factor, Socioeconomic Support, was not evaluated with ratings, but the proposals were to be ranked on a comparative basis among other offerors. AR 110, 112. This factor favored offerors who proposed a higher percentage and variety of participation by small, small disadvantaged and women-owned small businesses. AR 110. The solicitation further noted that

"[a]n overall comparative assessment w[ould] then be made taking into account all technical evaluation factors and price to determine the source that represents the best value to the Government." AR 112.

### B. Offers and First Award

The solicitation closed on April 28, 2011 with [* * *] offers on Portion 2 received from [* * *] BAE; [* * *] and Plasan. AR 147.[* * *] AR 148. All [* * *] of the offers remained in the competitive range, and DLA conducted negotiations in accordance with FAR § 15.306(c). *Id.* [* * *] offerors responded to negotiation letters on January 4, 2012, and [* * *] withdrew its bid on Portion 2. AR 149. On January 13, 2012, the agency held a reverse auction to establish the lowest price. AR 154. After each remaining proposal was evaluated, the Source Selection Authority ("SSA") determined BAE's proposal represented the best value to the Government and awarded Portion 2 to BAE on April 6, 2012. AR 146–175, 178–83. DLA conducted a post-award debriefing with Plasan in accordance with FAR 15.506 on April 11, 2012. AR 186.

### C. First GAO Protest and Corrective Action

Plasan filed a GAO protest on April 23, 2012. *Id.* On May 15, 2012, DLA advised GAO that it would take corrective action, and allow offerors the opportunity to provide additional relevant information with respect to the Past Performance/Experience factor. AR 200–01 It intended to reevaluate past performance and issue a new award. *Id.* Accordingly, the protest was dismissed on May 18, 2012. AR 186. On May 23, 2012 DLA sent discussion letters to BAE, [* * *] and Plasan, also stating that it intended to make award without further negotiations or revisions.[2] *Id.* at 205. In its letter to Plasan, DLA identified two deficiencies—under the Experience sub-factor, it did not consider Plasan's submission of vehicle armor contracts to be "similar" to the ESAPIs such that they would be considered relevant experience.[3] AR 204. On the third sub-factor,

---

2. [* * *]

3. The letter stated, that the vehicle armor contracts were not similar "because of differing bal-

listics and other testing requirements" and were therefore excluded from evaluation. AR 204.

Compliance with Contractual Socioeconomic Subcontracting/Mentoring Goals, DLA advised that Plasan had not listed their subcontracting goals over the period of time of the referenced contracts, but rather the actual percentages subcontracted. *Id.* In its revised Past Performance/Experience submission, Plasan included its Small Business Program Goals for 2012,[4] as well as a summation of its body and vehicle armor experience, and that of [* * *], its proposed supplier. AR 212–244. To further support the relevance of its vehicle armor contracts, it also provided a White Paper authored by [* * *], explaining the similarities between the two types of armor. AR 250–54. While many of its body armor contracts were for research and development, one for ballistic insert plates showed quantities of [* * *] shipped per month. AR 235.

In its letter to BAE, DLA informed BAE of a deficiency not addressed in the prior Past Performance evaluation concerning a [* * *] FAT failure under contract [* * *] for ESAPIs. AR 265. DLA gave BAE an opportunity to provide justification and clarification relating to the quality issues, as well as any other relevant past performance information. *Id.* In its response, BAE explained that following the FAT failure [* * *] it did not resubmit a new article [* * *]. Rather, it focused on completing the XSAPI development portion [* * *]. *Id.* BAE also submitted its work on [* * *] for XSBI, another type of ballistic insert. AR 276. It explained that it experienced [* * *]. *Id.* BAE also provided contracts demonstrating experience with aerospace and vehicle armor, noting that it had not previously submitted these contracts because it did not consider them relevant to hard body armor. AR 276–77.

Discussions closed on May 30, 2012, and the agency performed a new past performance assessment for both BAE and Plasan. AR 186.

### D. Evaluation and Second Award

The second assessment resulted in the same outcome, with BAE's offer selected as the best value to the Government. AR 281. In DLA's evaluation, both Plasan and BAE obtained Passing Ballistics Test Results in accordance with the first factor. AR 284. With respect to the second factor, the SSA found BAE superior to Plasan in the Experience sub-factor based on experience with the same or similar items at quantities at or exceeding the monthly maximum listed in the solicitation. AR 284–87. DLA evaluated four BAE contracts for the same or similar items, two of which produced at similar quantities to the 19,950 plates per month in the solicitation for Portion 2.[5] AR 284–85. Plasan provided [* * *] contracts/delivery orders for consideration, [* * *] of which were similar to the solicited item, but none of which produced at the monthly quantity required.[6] AR 285. DLA declined to consider Plasan's vehicle armor contracts relevant at the recommendation of ESAPI Engineer Nicholas Haynes. *Id.* Mr. Haynes considered the two types of armor to be dissimilar in nature, as they have different ceramic thickness, use different types of ballistic fabrics, have performance differences, and body armor has curved surfaces. *Id.* Mr. Haynes also found body armor has lower areal densities, making it more difficult to consistently produce parts meeting the ballistic requirements. AR 285–86. DLA also did not consider [* * *] past performance in evaluating Plasan, finding [* * *] to be a component supplier and not the end item manufacturer. AR 286. Stating that the ESAPI system "is manufactured in accordance with a performance specification," DLA found this to mean "the design and manufacture ... is entirely up to the end item manufacturer." *Id.* Since the [* * *] contracts featured [* * *] as an end-item manufacturer rather than Plasan, DLA regarded them as irrelevant to Plasan's

---

4. Plasan only provided Small Business Program Goals for 2012 and the actual percentages subcontracted. AR 225–27. It did not include its goals for subcontracting during the period of the referenced contracts in its proposal. *Id.*

5. These included a contract for the same ESAPI plates, at monthly quantities up to [* * *]. The XSBIs produced [* * *] demonstrated a monthly quantity rate of up to [* * *] per month, exceeding the requirements.

6. [* * *]

Past Performance.[7] *Id.* BAE received a "[* * *]" for the experience sub-factor and Plasan a "[* * *]." AR 285–87.

On the Quality of Items/Delivery Performance sub-factor, the SSA found Plasan had an advantage and was "slightly superior," this time rating Plasan [* * *] and BAE [* * *]. AR 287–89. In arriving at BAE's rating, the SSA considered quality issues under three of its contracts, and delivery issues on one. AR 287–88.[* * *] for ES-APIs, BAE experienced consecutive lot failures, requiring it to resubmit and qualify a new first article. AR 287. This caused an interruption to production, however, the SSA found BAE "did take effective corrective actions and did not have any other quality issues during the remainder of the contract." *Id.* The SSA next discussed the single lot failure [* * *] for XSBI, and stated that BAE "quickly found the cause of the failure, corrected the issues, and restarted production." *Id.* [* * *] for ESAPI and XSAPI, the SSA stated BAE "did not have any quality issues under the XSAPI portion of the contract" and then discussed the failed FAT on the ESAPI portion, [* * *]. *Id.* With regard to delivery performance and delays [* * *] the SSA found [* * *] *Id.* The five delayed orders ranged from approximately [* * *] at the most. *Id.* For Plasan, the SSA evaluated its deliverables—such as test reports and hardware sample quantities—on research and development contracts for their quality and found the quality met or exceeded all requirements. AR 288. While DLA was unable to reach several of the points of contact for Plasan's foreign contracts, it did consider letters of reference which described "almost no quality issues." *Id.* Plasan met or exceeded delivery requirements, where verifiable. *Id.* Ultimately, the SSA found Plasan "only slightly superior ... given BAE's overall record which demonstrates that it can provide the same or similar item without significant quality or delivery issues." AR 289.

The two offerors were both determined to be compliant with their socioeconomic goals and were equally [* * *] for the third Past Performance sub-factor. AR 290. For the final and least important factor, Socioeconomic Support, the SSA found Plasan superior, however noted the amount of work to be subcontracted was very similar.[8] AR 291. Likewise, the SSA noted the price difference between the two proposals was negligible, as it Plasan proposed a lower price by less than [* * *]. AR 293. The SSA provided an overall ranking of [* * *] for both offerors, and then found that BAE's superiority in the Experience sub-factor trumped Plasan's slight superiority in the Quality of Items/Delivery Performance sub-factor and slight superiority in the less important third factor, and awarded the contract to BAE on September 17, 2012. AR 292–94.

### E. Current Protest

DLA held a debriefing on September 27, 2012, and on October 2, 2012 Plasan filed a new GAO protest. AR 34. On November 16, 2012, Plasan filed its protest in this Court, and withdrew its GAO protest.

## II. Discussion

In addition to its motion for judgment on the administrative record, intervenor-defendant BAE seeks to dismiss this case on standing grounds. Def.-Intevenor's Mot. to Dismiss and for J. on the Admin. R. ("Int.'s MJAR") 14–19. The Court will first address the matter of Plasan's standing, as standing is a threshold jurisdictional issue. *Navarro Research & Eng'g, Inc. v. United States,* 94 Fed.Cl. 224, 228 (2010) (citing *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002)).

### A. Standing

■ BAE asserts that Plasan does not have standing to bring this case, as it does not have a "substantial chance" of being awarded the contract, even if it prevailed in this protest. Int.'s MJAR 14. BAE con-

---

7. In addition to the ceramic tiles, ESAPIs use highly specialized unidirectional polyethylene fabrics, which are equally important to withstand ballistic testing. AR 286. The quality of the product is measured by how these components perform together as an end item. *Id.*

8. Plasan's proposed percentages were [* * *] compared to [* * *] for BAE. AR 291.

tends that because Plasan relied heavily on [* * *] in its proposed performance of the contract—it would use [* * *] design, [* * *] would supply the ceramic materials and provide consulting assistance—award to Plasan would in effect be [* * *] to [* * *]. *Id.* at 15. Since DLA sought to maintain alternative sources of ESAPIs by awarding to separate sources and [* * *], Plasan should not have been eligible for award. *Id.*

Plasan responds that it clearly has standing, because it—[* * *]—submitted the proposal which was evaluated by the agency, and the SSA did not even consider [* * *] involvement. Pl.'s Cons.Resp. to Def. and Def.-Intervenor's Cross–Mots. for J. on the Admin. R. ("Pl.'s Resp. to MJAR") 18; AR 189, 286. It also contends that only one of its six designs submitted was by [* * *], and that manufacturing of the ESAPIs would take place in Plasan's Vermont facility. *Id.* at 18–19. Finally, it reiterates that the Government has already expressed its position characterizing [* * *] as merely a component supplier, and not an end-item manufacturer. *Id.* at 19.

In a bid protest, only an "interested party" has standing to challenge a contract award. *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed.Cir.2006). The term "interested party" in section 1491(b)(1) of the Tucker Act is construed according to its definition in the Competition in Contracting Act, and is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract. *Myers,* 275 F.3d at 1370 (Fed.Cir. 2002) (quoting *Am. Fed'n of Gov't Emps. v. United States,* 258 F.3d 1294, 1302 (Fed.Cir. 2001)).

An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. *Orion Tech., Inc. v. United States,* 704 F.3d 1344, 1347–48 (Fed.Cir.2013) (citing *Rex Serv. Corp.,* 448 F.3d at 1307). A party must show 1) that it is an actual or prospective bidder and 2) that it has a direct economic interest. *Id.* Generally, to prove the existence of a direct economic interest, a party must show that it had a "substantial

chance" of winning the contract. *Id.; Navarro Research & Eng'g, Inc.,* 94 Fed.Cl. at 229 (2010). *See Myers,* 275 F.3d at 1369–71 (affirming finding that protestor did not have standing where it was not a responsible bidder such that it could have been awarded the contract); *Int'l Mgmt. Servs., Inc. v. United States,* 80 Fed.Cl. 1, 6–7 (2007) (plaintiff was not an "interested party" because it had no chance, much less a substantial chance, of award since it was not a small business on a small business set aside contract, and there remained a qualified bidder in competitive range).

Unlike protestors in *Myers* or *Int'l Mgmt. Servs.,* everything in the record indicates that Plasan had a substantial chance of being awarded the contract, notwithstanding its likely use of [* * *] as a supplier. DLA accepted its proposal as responsive, placed it in the competitive range, and evaluated its proposal. *See* AR 147–48 ("all offers remained in the competitive range"), 188–192, 284–293. Plasan's ratings also closely matched BAE's, giving it a substantial chance of award. AR 292–93. DLA knew of [* * *] proposed involvement as a supplier, and took no steps to reject the proposal on these grounds. AR 286. Finally, there was no restriction in the solicitation which limited use of component suppliers or subcontractors; [* * *]. The Court therefore finds Plasan has standing to bring this protest.

### B. Judgment on the Administrative Record

RCFC 52.1 provides for motions for judgment on the administrative record, which is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed.Cir.2005). In reviewing cross-motions for judgment on the administrative record, the court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States,* 72 Fed.Cl. 126, 131 (2006).

### 1. Standard of Review for Bid Protests

In a post-award bid protest such as this one, the Court follows the Administra-

tive Procedure Act's standard of review to determine whether an agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 354 (2009) (quoting *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004)). The standard accommodates "a zone of acceptable results in each particular case, but requires the agency's final decision be the result of a process that 'consider[s] the relevant factors' and is 'within the bounds of reasoned decision making.'" *Info. Sciences Corp. v. United States*, 80 Fed.Cl. 759, 773 (2008) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)). The court's role is "not to substitute its judgment for that of the agency, but rather to determine whether the agency had a rational basis for its decision." *Vanguard Recovery Assistance v. United States*, 101 Fed.Cl. 765, 785 (Fed.Cl.2011) (citing *Alabama Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed.Cir.2009)). The Federal Circuit has described this review as "highly deferential" and as requiring "a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed.Cir. 2000) (citing *Bowman Transp. Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). As long as "the court finds a reasonable basis for the agency's actions, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)).

 If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404

F.3d at 1351. If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement error of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057); *Kerr Contractors, Inc. v. United States*, 89 Fed.Cl. 312, 319 (2009), *aff'd*, 374 Fed.Appx. 979 (Fed.Cir.2010).

 In the bid protest context, an agency's decision "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Turner Constr. Co., Inc. v. United States*, 94 Fed.Cl. 561, 571 (2010), *aff'd*, 645 F.3d 1377 (Fed.Cir.2011); *FFTF Restoration Co., LLC v. United States*, 86 Fed.Cl. 226, 236 (Fed.Cl.2009) (quoting *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed.Cir.2008)). Contracting officers are allowed to exercise a wide amount of discretion in this arena. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir. 2001). If a party brings a challenge on the first ground, a court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion ... and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotations omitted). To show a violation of a regulation or procedure, the disappointed bidder "must show 'a clear and prejudicial violation of applicable statutes or regulations'" in order to succeed. *FFTF Restoration Co., LLC*, 86 Fed.Cl. at 236 (quoting *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1331 (Fed.Cir.2004)).

### 2. DLA's Evaluation of the Past Performance Factor

Plasan challenges every aspect of DLA's evaluation of the Past Performance factor, finding its evaluation of all three sub-factors improper, as well as the weight given them. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") 8–34.

■ Past performance information is used as an indicator of an offeror's ability to perform the contract successfully. FAR § 15.305(a)(2)(i). Currency and relevance of the information, source of the information, context of the data, and general trends in the contractor's performance are considered. *Id.* The source selection authority determines the relevance of similar past performance information. FAR § 15.305(a)(2)(ii). When the Court considers a challenge to the past performance evaluation conducted in the course of a negotiated procurement, "the greatest deference possible is given to the agency." *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004); *Overstreet Elec. Co. v. United States,* 59 Fed.Cl. 99, 117 (2003) ("[W]hen a procurement involves performance standards . . . a court must grant *even more* deference to the evaluator's decision . . . a triple whammy of deference"); *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 319 (2002) ("An agency is accorded broad discretion when conducting its past performance evaluations.") (citing *SDS Int'l v. United States,* 48 Fed.Cl. 759, 769 (2001)). As long as evaluators "considered the relevant factors and information and articulated a reason for their decision that is not clearly erroneous, the Court will defer to the judgment of the Executive branch." *Gulf Group,* 61 Fed.Cl. at 353; *Overstreet Elec. Co.,* 59 Fed.Cl. at 102 (noting the "near draconian" standard of review).

■ The deference the Court gives an agency in performing a past performance evaluation is not, however, without limit, as "it is settled law that past performance evaluations are subject to the same APA review as other agency actions challenged in this court on a bid protest." *CSE Constr. Co. v. United States,* 58 Fed.Cl. 230, 252 (2003); *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 567 (2000) (stating that "bound by the arbitrary and capricious standard of review, the exercise of this discretion obviously must be reasonable"). Accordingly, the Court's review of an agency's "evaluations of an offeror's . . . past performance should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory re-

quirements." *Univ. Research Co., LLC v. United States,* 65 Fed.Cl. 500, 505–06 (2005) (quoting *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 659 (2002)).

### (a) Past Performance—Experience Sub-factor

■ Plaintiff maintains that its submission of more information, revising its past performance to include eighteen contracts/orders (AR 229–35, 288, 311), should have resulted in an increased score but it did not. Pl.'s MJAR 22. Specifically, its total number of units per month increased from a quantity of [* * *]. *Id.* Plaintiff also asserts that DLA arbitrarily excluded certain contracts from consideration in its past performance evaluation, including those for vehicle armor, and those relating to the past performance of [* * *], Plasan's major subcontractor. *Id.* at 24–34. The Government and intervenor argue that just because Plasan may disagree with the agency's determination, that does not render it unreasonable, but rather the SSA reasonably relied upon the contrary determination of Nicholas Haynes, who found the two types of contracts not similar. Def.'s Mot. for J. on the Admin. R. ("Def.'s MJAR") 16–19; Int.'s MJAR 34–37. The Government also asserts that the agency examined both manufacturing and performance requirements to determine similarity. Def.'s MJAR 19.

The solicitation requires offerors to describe their experience "producing the same or similar item(s)" within two years preceding the solicitation date." AR 102. The ratings refer to whether experience is "with items/services of a similar kind and complexity to the solicited items/services at or below quantities similar to the maximum quantities." AR 121. Plasan submitted the White Paper of [* * *] along with its revised past performance information, and accuses DLA of changing its standard in determining what constitutes relevant past performance, shifting from results-based comparisons to ceramic materials and densities of the armor. Pl.'s MJAR 28.

■ The determination of a contract's relevance for past performance evaluation is

committed to the agency's discretion. *See Glenn Def. Marine (Asia), PTE Ltd. v. United States,* 105 Fed.Cl. 541, 574 (2012). "[A]n agency, in evaluating past performance, can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract." *Forestry Surveys & Data v. United States,* 44 Fed.Cl. 493, 499 (1999) (decision to weigh previous year's identical contract more heavily in past performance evaluation was "eminently reasonable" and "within the sound discretion of evaluators"). Nothing in the regulations, however, requires that more relevant past performance receives greater weight in the evaluation. *Univ. Research Co.,* 65 Fed.Cl. at 506. The matter is largely discretionary, and "the SSA 'may give unequal weight,' or no weight at all, 'to different contracts when [the SSA] views one as more relevant than another.'" *Linc Gov't Servs. LLC v. United States,* 96 Fed.Cl. 672, 718 (2010) (quoting *SDS Int'l v. United States,* 48 Fed.Cl. 759, 769 (2001)). *See J.C.N. Const., Inc. v. United States,* 107 Fed. Cl. 503, 515 (2012) (upholding past performance evaluation, and stating that despite the fact that the Court would have graded the offerors' past experience differently, it was rational for evaluators to conclude differences in square footages in projects submitted did not greatly detract from offerors' abilities to perform solicited work); *Gulf Group Inc.,* 61 Fed.Cl. at 354 (stating "it was for the TET to determine whether contracts were of a similar magnitude" and upholding determination since only one of protestor's ten submissions fell within dollar range illustrating relevance).

Given the high degree of discretion accorded an agency in its past performance determination, the Court finds that DLA's decision not to consider vehicle armor contracts similar to body armor was not arbitrary and capricious, as it provided sound reasons for its decision. AR 189, 285–86. ESAPI engineer Nicholas Haynes found vehicle armor and personal body armor produce parts that are dissimilar in nature, have differing ceramic thicknesses, use different types of ballistic fabrics, have performance differences, and have different shapes, as body armor features curved surfaces. AR 189. Addi-

tionally, vehicle armor is afforded higher areal densities, while body armor seeks to reduce the load on the solider. *Id.* While [* * *] holds a contrary opinion regarding the similarities, the standard of review is not who is more correct in evaluating the similarities or how the Court would decide the question, but whether the agency provided a reasonable rationale for its decision. *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 354. The Court finds Mr. Haynes' opinion discussing areal densities and ballistic fabrics provides such a reasonable rationale. AR 189.

Plasan next asserts that DLA should have considered [* * *] well-established past performance record because Plasan is using a [* * *] design, supplies, and planned to use the company as a consultant, giving it a major role in the contract and making it important to evaluating Plasan's ability to successfully complete the contract. Pl.'s MJAR 30–33. The Government contends that the agency reasonably determined that because [* * *] was not an end-item manufacturer, its past performance would not be considered. Def.'s MJAR 20. Additionally, the referenced contracts featured [* * *] as a prime contractor rather than in a subcontracting role, and would not be predictive of Plasan's ability as prime contractor. *Id.* at 21. Finally, it was not even guaranteed that Plasan would be using [* * *], since it could choose a different ceramic tile when presenting the first article sample if selected. *Id.* at 21–22. Intervenor argues that while DLA may have chosen to consider [* * *], it was not required to do so, and the determination not to consider [* * *] was reasonable and within its discretion. Int.'s MJAR 36–37.

The FAR states that an "evaluation should take into account past performance information regarding ... subcontractors that will perform major or critical aspects of the requirement when such information is relevant to the instant acquisition." FAR § 15.305(a)(2)(iii). Contrary to plaintiff's argument that this requires review of critical subcontractors, this Court has interpreted this phrase as a permissive rather than mandatory consideration. "[T]he SSA *'should,'* not must, 'take into account past perform-

ance information regarding ... key personnel ... or subcontractors.'" *PlanetSpace, Inc. v. United States,* 92 Fed.Cl. 520, 539 (Fed.Cl.2010) (emphasis in original) ("[W]hile it would have been reasonable for the SSA to ... conclude that the past performance of plaintiff's ... subcontractors was relevant and in plaintiff's favor, it was also reasonable for the SSA to conclude otherwise, given plaintiff's own lack of past performance."). *See Linc Gov't Servs.,* 96 Fed.Cl. at 718 ("[T]he FAR provides merely that the SSA 'should,' rather than must, 'take into account past performance information regarding ... subcontractors.'").

The Court finds that it was reasonable for DLA not to consider the past contracts of [* * *]. While such review is permissive rather than mandatory, *Linc Government Servs. LLC v. United States,* 96 Fed.Cl. 672, 718 (2010), the Government rationally supported its decision not to consider the work of [* * *], as only Plasan would be supplying the end item, which featured more component materials than just the ceramic plates. [* * *] contracts which Plasan submitted also differed in that they featured [* * *] in a prime, rather than subcontractor role. These facts rationally support its decision to exclude references for [* * *] past performance.

### (b) Past Performance—Quality of Items/Delivery Performance Sub-factor

██ Plasan also protests DLA's evaluation of BAE on the Quality of Items/Delivery Performance sub-factor, which it argues lacks a rational basis given BAE's poor performance on past contracts. Pl.'s MJAR 10–19. DLA evaluated BAE as [* * *] on this sub-factor, which Plasan maintains was erroneous, as that rating was appropriate when the offeror [* * *] and experienced [* * *]. *Id.* at 11. Plasan characterizes BAE's problems as far more significant than [* * *]. *Id.* Plasan contends that BAE more properly should have been scored [* * *] or at best, a very low [* * *]. *Id.* at 19. Additionally, Plasan argues that key findings in the source selection decision document ("SSDD") are incorrect and were relied upon by the SSA in her decision. *Id.* at 14.

In response, the Government characterizes Plasan's challenge as merely attempting to substitute its judgment for that of the SSA. Def.'s MJAR 23. It points out the large amount of agency deference, particularly relevant in contracts of considerable size and complexity, in exercising judgment with regard to evaluating past quality issues, delays, and their significance. *Id.* at 25. The Government maintains that the SSA properly focused on BAE's abilities to produce items without major problems and successfully perform corrective action when necessary. *Id.* at 26. The failure to document every last lot failure did not prejudice Plasan, as BAE still would have been found superior. *Id.* at 25–27. Plasan responds that it is not this Court's role to evaluate how the SSA would have responded to the new information; the mere fact that she relied on incorrect information—particularly in light of how close this procurement was—is determinative that the decision was arbitrary and capricious, and prejudicial to Plasan. Pl.'s Resp. to MJAR 2–3.

Plasan points out three statements in the SSDD, the first two of which relate to [* * *], and the last to [* * *]. *See* AR 287–89, 290–91, 293. It asserts that these statements are erroneous and show an attempt to "whitewash" BAE's poor performance, as well as bad faith on the part of the evaluators, who knew of BAE's failures and did not alert the SSA. Pl.'s Resp. to MJAR 17–18.

BAE performed [* * *] BAE experienced two consecutive lot failures, which, consistent with the terms of the solicitation, required it to submit a new first article for testing. AR 347, 400. During this time, the company stopped production until a new first article could be submitted and authorized under the FAT criteria. AR 353. Following the FAT approval, BAE failed [* * *] lot acceptance tests, and experienced delays on five orders, [* * *]. AR 418, 753. In evaluating BAE's past performance, the SSA considered the consecutive lot failures and new first article testing in the SSDD, and found that BAE took effective corrective actions "and ***did not have any other quality issues*** during the

remainder of the contract." AR 287, 332 (emphasis added).

Plasan states that this finding was factually untrue in that BAE failed [* * *] lot acceptance tests the following year. AR 348, 418. It supports this position by arguing that the SSA cannot deny lot failures are "quality issues," since the SSDD recognized a lot failure as a "quality issue" [* * *]. AR 287. Finally, it contends that these continuing failures further indicate BAE's corrective action was not successful, as failures continued even after the new FAT resubmittal. Pl.'s Resp. to MJAR 5–6.

The second SSDD statement concerns the five delivery delays, which Plasan argues the SSA erroneously attributed to the early lot failures and FAT resubmittal. The SSDD states *"[d]ue to the production lot failures mentioned above*, BAE Systems experienced late deliveries on five of their delivery orders within the evaluation period[.]" AR 287, 293 (emphasis added). Plasan seems to suggest that by attributing these delays to the FAT resubmittal, the SSA figured the delays were a ripple-effect problem, when in fact they were unrelated and constituted new, independent failures. Pl.'s Resp. to MJAR 5. The Government responds that regardless of the cause of the delays, the agency acknowledged them and the fact of their occurrence was factored into the SSA's decision. Def.'s Resp. to Pl.'s MJAR 10–11.

The final erroneous statement concerns the [* * *], which had both an ESAPI and XSAPI portion. Plasan contends that the SSA relied on erroneous information by stating that BAE *"did not have any quality issues* under the XSAPI portion of the contract" when in fact there had been a [* * *]. AR 289, 293, 348–49. In response, BAE characterizes this [* * *] as evidence of its dedication to quality control, and states that it was not indicative of any negative trend in product performance, but that once testing resumed at Aberdeen Testing Center, it fin-

ished the remainder of the contract without test failures or performance issues. AR 348.

Much of this protest comes down to the issue of BAE's lot failures, and whether these are significant quality issues, such that their omission from the SSA's consideration prejudiced Plasan. Plasan argues that clearly the Government considers them to be quality issues, as they were referenced in [* * *] as quality issues. AR 287. It further argues that the fact that lot failures were left out of the SSDD makes the SSA's evaluation erroneous and incomplete, and that this Court cannot assume the role of determining what it thinks the SSA would have decided had she been provided with the extra lot failure information. *See id.* The Government and BAE argue that Plasan grossly mischaracterizes what are common occurrences in contracts of this scale, and that lot failures are anticipated, with detailed procedures for handling them even specified in the solicitation.[9] *See* AR 76–78. Individual lot failures do not typically result in production stoppages unless they are consecutive or a pattern of negative trending or failure is demonstrated, in which case the Government may withhold acceptance and cease production. AR 77–78. [* * *] The Government and intervenor also argue that Plasan was not prejudiced by the exclusion of some lot failures, as these were minor enough not even to warrant mention by the SSA. Def.'s Resp. to Pl.'s MJAR 12–13. More important for evaluation purposes was BAE's record of timely and proper corrective action. *Id.* at 13.

Despite this being the strongest ground for Plasan's protest, the Court agrees with the Government. As noted in *Westech,* an offeree is not entitled to an exhaustive comparison of past performance. *Westech Int'l, Inc. v. United States,* 79 Fed.Cl. 272, 294 (Fed.Cl.2007) ("that level of detail is not required"). Here, DLA was not required to exhaustively recite every one of BAE's past

---

9. The solicitation specifies that upon a lot acceptance test failure, the contractor will segregate the material of the lot in question and conduct a failure analysis and provide a Failure Analysis and Corrective Action Report within ten days after notification of the failure. AR 77. Within ten days of receipt, DLA determines if production

of the approved FAT configuration may resume, or whether the contractor must conduct a new FAT. *Id.* The Government may also withhold acceptance and cease all production upon a pattern of negative trending or failure outside the two failed consecutive lots rule. AR 78.

lot acceptance failures, but rather to use discretion in reasonably evaluating past performance through work on other similar contracts. This the agency did, and it is clear from the SSDD that while noting the past failures, it was the overall trend of corrective action that was important to the agency, and supportive of its conclusion that "BAE's overall record [ ] demonstrates that it can provide the same or similar item without significant quality or delivery issues." AR 289. While the [* * *] did have [* * *] lot failures following the first article resubmittal, BAE points out that none of these lot acceptance test failures were indicative of a downward trend in performance, [* * *] AR 348. BAE delivered up to [* * *] ESAPIs per month over the final five delivery orders without quality issues. AR 293. Similarly, the failure on the XSAPI portion of the [* * *] did not suggest any negative spike or trend in product performance, and BAE believed it was due [* * *]. *Id.* Nor does the disputed cause of the [* * *] delays—as attributable to the later lot acceptance failures as opposed to the earlier, pre-FAT resubmittal failures—change the result that the fact of the delays was considered by the SSA in finding BAE [* * *] AR 287, 293. Even taken together, these omissions do not overturn the SSA's conclusion that "[o]verall because of its effective corrective actions, BAE has not had significant quality or delivery problems." AR 293.

The Court finds that Plasan was not prejudiced to the extent the SSDD omitted mention of lot acceptance failures on [* * *] as quality issues, and discussed the five delay orders as stemming from the FAT resubmittal. It is established law in this circuit that non-prejudicial errors in a bid process do not automatically invalidate a procurement. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir.1993) ("[S]mall or immaterial errors are generally not adequate grounds for a successful protest."); *Andersen Consulting v. United States*, 959 F.2d 929, 932

(Fed.Cir.1992) ("[O]verturning awards on de minimus errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations."). Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [Government's] errors in the [procurement] process." *Bannum*, 404 F.3d at 1358 (citations omitted). *See Gulf Group, Inc.*, 61 Fed.Cl. at 358 (finding that even if technical evaluation team made a mistake in overlooking the different grade, they did not clearly err in assigning risk rating in light of this mistake, and error was of the variety of "small or immaterial errors" not sufficient to invalidate a procurement decision) (citing *Lockheed*, 4 F.3d at 960; *Grumman Data Systems Corp.*, 15 F.3d at 1048).

Finally, this case is distinguishable from *Ashland*, in which the errors—evaluating failures taking place wholly outside the specified time period, and faulting an excused delay—were more prejudicial than those here. *Ashland Sales and Serv. Co.*, B–291206 (Comp.Gen.), 2002 WL 32001879, at *7–8 (Dec. 5, 2002). While as *Ashland* counsels, it is proper to examine in detail the accuracy of facts relied upon in a past performance review, quality issues must be kept in their context, lest the evaluation become a laundry list of every minor issue rather than a reasoned conclusion drawn from the analyzing the overall past performance. Therefore, plaintiff does not succeed in showing prejudice necessary to overturn the award on this ground.

### (c) Past Performance—Socioeconomic Contracting Goals

Plasan also extends its protest to the third sub-factor of Past Performance, Compliance with Contractual Socioeconomic Subcontracting/Mentoring Goals. Plaintiff argues that DLA improperly found BAE's compliance "[* * *]" when in fact it did not meet its subcontracting goals for any of the three contracts under consideration. Pl.'s MJAR 19. Plasan maintains that DLA failed to appropriately credit it with new information relating to its own small business contracting record, after it submitted additional contracts

with impressive small business contracting records. Pl.'s MJAR 23; AR 312. The Government responds that both ratings were reasonable and consistent with the solicitation's [* * *] rating, in that both BAE and Plasan demonstrated compliance with this factor. Def.'s MJAR 28–30.

The SSA determined that although BAE did not meet its goals on the past contracts evaluated, it came very close on one, contracted to HUBZone and Veteran Owned Small Businesses on another, and showed significant efforts on a third contract, on which work was just beginning. AR 289–90. It therefore rated BAE as [* * *]. AR 290. With regard to Plasan, the SSA found that [* * *] Id.

This sub-factor was a comparison, which examined planned performance alongside actual performance by business category. AR 103. Given the evidence of both companies' experience subcontracting to small businesses, it was rational for the SSA to find BAE and Plasan each warranted [* * *] ratings.

### (d) Weight of Sub–Factors

■■■ Plasan also asserts that DLA placed more importance on the "Experience" sub-factor, which was to be weighted equally with the "Quality of Items/Delivery Performance" sub-factor pursuant to the solicitation. *Id.* at 8–10. This argument has little merit. It is well established that adjectival ratings are merely a guide. *Hyperion Inc. v. United States*, 92 Fed.Cl. 114, 119 (2010). In its evaluation of sub-factors, the SSA found BAE "slightly superior" in the Experience sub-factor, and Plasan "slightly superior" in the Quality if Items/Delivery Performance sub-factor, but determined that Plasan's advantage "is not significant" and that the superiority of BAE trumps the slight superiority of Plasan. AR 293. Award to BAE did not mean that Experience was weighted more heavily, but rather that BAE outperformed Plasan on Experience by a greater magnitude than Plasan outperformed BAE on Quality of Items/Delivery Performance. This is perfectly reasonable, and consistent with the solicitation.

### 3. Best Value Trade-off

Plaintiff next alleges that the Government's best value tradeoff was arbitrary, capricious, and contrary to the solicitation, in that a company who tied on one factor and "won" both other factors was not awarded the contract. Pl.'s MJAR 5–8.

■■■ The greater the degree discretion vested in the contracting officer, the more difficult the protestor's burden becomes. *DynCorp Int'l v. United States*, 76 Fed.Cl. 528, 537 (2007). Negotiated procurements allow the contracting officer a "breadth of discretion," imposing a heavier burden of proof on the protestor, and "best-value" awards afford the contracting officer additional discretion. *Id.* Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." *Id.*; *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996); *TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *Afghan Am. Army Services Corp.*, 90 Fed.Cl. at 355.

■■■ A best-value determination is a "tradeoff process" that "is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror." FAR § 15.101–1(a). Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *E.W. Bliss Co.*, 77 F.3d at 449 (citing *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir.1993)); *cf. Widnall v. B3H*, 75 F.3d 1577, 1580 (Fed.Cir.1996) (Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different proposal."). The Court will not disturb a best-value award so long as the agency "documents its final award decision and includes the rationale for any business judgments and tradeoffs made." *Blackwater Lodge & Training Ctr. v. United States*, 86 Fed.Cl. 488, 514 (2009). This requires looking beyond the adjectival ratings, "because proposals awarded the same adjectival ratings are not necessarily equal in quality." *Id.* at 514. The test is therefore one of reasonable justi-

fication. *See id.* at 515–16 ("The law does not require the SSA to conduct an identical analysis of [the successful offeror's] unique strengths.... [I]t only compels the SSA to determine whether [the protestor's] unique strengths warranted the premium represented by its higher-priced proposal.").

██ The SSA's decision finding BAE represented the best value to the Government adequately describes its rationale for the decision. After a side by side comparison of the two companies' performance on the Past Performance/Experience Factor, the agency found BAE slightly superior. AR 293. This is consistent with BAE's experience producing the solicited items at the same or greater quantities as those listed in the solicitation, compared to Plasan's more limited experience with research and development contracts and production at smaller monthly quantities, and Plasan's slight advantage on quality and delivery performance. *Id.* DLA then decided that despite the small difference in the least important factor of Socioeconomic Support and negligible price difference of [* * *], BAE's experience justified paying the nominal difference. *Id.* While Plasan attempts to convert the factors into rigid, objective categories in which a tie on the past performance factor necessarily means that the "winner" of the Socioeconomic Support factor receives the contract, this ignores the more discretionary nature of a tradeoff process in which it is proper to look beyond such automatic judgments to decide best value. Particularly in light of the small differences in Socioeconomic Support and price, DLA was justified in finding the past performance rating outweighed these other factors in making its award.

### 4. Bias by Evaluators

██ Finally, Plasan asserts that when viewed in totality, DLA's numerous decisions in favor of BAE illustrate a bias in its favor. Pl.'s MJAR 35. It argues that DLA deliberately minimized and "whitewashed" BAE's adverse performance track record, and that Mr. Haynes and Ms. Aguayo, having worked on past contracts with BAE, were aware of performance issues on past contracts, yet failed to alert the SSA. *Id.* Plasan challenges the objectivity of Mr. Haynes, who served as a reference for BAE in its proposal, and who, according to Plasan, is an "unabashed enthusiast for BAE." *Id.* at 36. Essentially, Plasan argues that when taken in combination, all of the allegedly arbitrary and capricious decisions favoring BAE suggest a more sinister motive of bias.

██ Government employees are presumed to act in good faith. *Chenega Mgmt. LLC v. United States,* 96 Fed.Cl. 556, 581 (2010) (citing *Savantage Fin. Serv. Inc. v. United States,* 595 F.3d 1282, 1288 (Fed.Cir. 2010)). In order to overcome this presumption, "the proof must be almost irrefragable." *Galen,* 369 F.3d at 1330. The Federal Circuit has equated "almost irrefragable proof" with clear and convincing evidence. *See id.* at 1330; *Am–Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234, 1239–40 (Fed. Cir.2002). This has also been equated with evidence of some specific intent to injure the plaintiff. *Savantage Fin. Serv. Inc.,* 595 F.3d at 1288; *Four Points By Sheraton v. United States,* 66 Fed.Cl. 776, 787 (Fed.Cl. 2005) (citing *Galen,* 369 F.3d at 1330).

None of Plasan's allegations come close to the irrefragable proof necessary to find bad faith in a government employee. Since the Court has found the decisions throughout the procurement to be reasonable and none of the actions at issue are indicative of a specific intent to injure Plasan, plaintiff has not met its burden to show bias or bad faith.

### 5. Injunctive Relief

██ To obtain a permanent injunction, a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. *PGBA LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir. 2004). Because Plasan has not succeeded on the merits, there is no basis for entering a permanent injunction. *See Bean Stuyvesant LLC v. United States,* 48 Fed.Cl. 303, 320–21 (2000) (there must be actual success on the merits to succeed in a request for a permanent injunction).

### III. Conclusion

Defendant and Intervenor's Motions For Judgment On The Administrative Record are GRANTED and Plaintiff's Motion For Judgment On The Administrative Record is DENIED. Furthermore, since the Court limited its review to the administrative record and did not consider the comments made by intervenor's counsel during oral argument in rendering its opinion, plaintiff's Motion To Strike is MOOT and is therefore DENIED. The clerk is directed to dismiss the complaint with prejudice. No costs.[10]

IT IS SO ORDERED.

---

10. This opinion is being issued redacted. The parties submitted redactions in accordance with the court's order of February 21, 2013.